HUST *v.* MOORE-McCORMACK LINES, INC.

No. 625.   Argued April 22, 29, 1946.—Decided June 10, 1946.

*Abraham E. Freedman* and *B. A. Green* argued the cause for petitioner. With them on the brief was *Edwin D. Hicks.*

*Erskine Wood* and *Erskine B. Wood* argued the cause and filed a brief for respondent.

Briefs were filed as *amici curiae* by *William L. Standard* and *Jacquin Frank* for the National Maritime Union of America; by *Silas B. Axtell* and *Myron Scott* for Josephine Fontao et al.; and by *Abraham E. Freedman, Milton M. Borowsky* and *Charles Lakatos* for the National Organization Marine Engineers Beneficial Association et al., urging reversal.

*Solicitor General McGrath, Assistant Attorney General Sonnett, Ralph F. Fuchs* and *Paul A. Sweeney* filed a brief for the United States as *amicus curiae*, urging affirmance.

MR. JUSTICE RUTLEDGE delivered the opinion of the Court.

This case arises by virtue of the fact that during most of the Second World War substantially our entire merchant marine became part of a single vast shipping pool, said to have been the largest in history,[1] operated and controlled by the United States through the War Shipping Administration.[2] So huge an enterprise necessarily comprehended many intricate and complex readjustments from normal, peacetime shipping arrangements. These

---

[1] As of the date of Japanese surrender the War Shipping Administration operated or owned approximately 4300 merchant ships, as compared with the 1375 ships available for deep-sea service in the prewar American merchant marine. The number of men needed for the wartime merchant marine was approximately 220,000, as compared with the prewar requirement of 55,000 men. For further figures on the expansion of the merchant marine during the war, see Note (1946) 55 Yale L. J. 584, note 1 and authorities cited.

[2] On February 7, 1942, the President, acting by virtue of the authority vested in him "by the Constitution and Statutes of the United States, including the First War Powers Act, 1941" (50 U. S. C. App. § 601), established the War Shipping Administration. Exec. Order No. 9054, Feb. 7, 1942, 7 Fed. Reg. 837, as amended by Exec. Order No. 9244, Sept. 16, 1942, 7 Fed. Reg. 7327.

were executed largely through broad powers conferred upon the Administration.[3]

Eventually almost every vessel not immediately belonging to naval and other armed forces came under the Administration's authority. Otherwise than by direct construction and ownership, this was accomplished by transfer from private shipping interests to the Administration, pursuant to requisition or other arrangement.

Inevitably the industry's transfer from private to public control was achieved to a very great extent by making use not only of private property but also of private shipping men, both in management and for labor.[4] This too

---

[3] The Executive Order provided that the Administrator of the War Shipping Administration should "control the operation, purchase, charter, requisition, and use of all ocean vessels under the flag or control of the United States . . . ." It also transferred to the War Shipping Administration "the functions, duties and powers conferred by law upon the United States Maritime Commission with respect to the operation, purchase, charter, insurance, repair, maintenance, and requisition of vessels and facilities required for the operation thereof . . ." under various specified statutes and executive orders "and under any other provisions of law, including Executive Orders . . . ."

The parties have not questioned the authority of the War Shipping Administration. The following statutes and executive orders relate to the authority exercised. § 902 (a), Merchant Marine Act of 1936, 46 U. S. C. § 1242 (a); § 902 (e), Merchant Marine Act of 1936, as amended, 46 U. S. C. § 1242 (e); § 207, Merchant Marine Act of 1936, as amended, 46 U. S. C. § 1117; §§ 1 and 2, Joint Resolution of February 6, 1941, 55 Stat. 5; Public Law 247, 77th Cong., 55 Stat. 669, 681; 50 U. S. C. App. § 1274; Exec. Order No. 9001, Dec. 27, 1941, 6 Fed. Reg. 6787, as amended by Exec. Order No. 9296, Jan. 30, 1943, 8 Fed. Reg. 1429.

[4] See H. Rep. No. 2572, 77th Cong., 2d Sess., 8: "The Administrator, in the conduct of his duties and functions, makes very extensive use of the private organizations including those engaged in merchant marine insurance and related activities, steamship operators, stevedore, and terminal facilities, freight forwarders, and freight brokers and agents. Special skill, knowledge, and experience are made available in this manner for use in the integrated war effort. This devel-

was brought about in various ways, but chiefly two for presently pertinent purposes.  One was by time-chartering of privately owned vessels with crew, in which case the men remained the private employees of the vessel's owner.  The other was by either bareboat-charter or outright ownership by the Administration.  In such instances, as will appear, master and seamen became technically employees of the United States.[5]

The difference is important for the issues and the decision in this case.  They concern the broad question whether seamen employed in the latter capacity, as members of the United States Merchant Marine,[6] lost during the period of such service prior to March 24, 1943,[7] some of the American seamen's ordinary and usual protections in respect to personal injury or death incurred in the course of employment, or retained those rights.  Specifically, in this case the question is whether petitioner Hust retained the seaman's usual right to jury trial in a suit against the respondent, pursuant to the provisions of the Jones Act,[8] for personal injuries incurred in the course of his employment as a seaman on the S. S. Mark Hanna.

opment confirms the wisdom of the congressional policy in the recent years of stimulating and assisting the development of such private merchant marine and insurance facilities at substantial Government cost.  The policy has permitted a quick change-over from peacetime to wartime operations of the entire merchant marine without any substantial loss of efficiency or impairment of morale."

[5] See H. Rep. No. 2572, 77th Cong., 2d Sess., 8–10.

[6] The seamen employed on Government-operated vessels were, of course, in civilian, as opposed to military or naval, service.  Cf. Hearings before the Committee on the Merchant Marine and Fisheries on H. R. 7424, 77th Cong., 2d Sess., 5–6.

[7] The effective date of the so-called Clarification Act, 50 U. S. C. App. § 1291, discussed at various points in this opinion.  Relevant portions of the Act are set forth in the text herein at note 36 and in note 35.

[8] § 33, Merchant Marine Act of 1920, 46 U. S. C. § 688.

This was a Government-owned Liberty ship operated under a so-called General Agent Service Agreement between respondent and the Administration.

The Mark Hanna had been torpedoed in the Atlantic Ocean on March 9, 1943. Early on the morning of the 17th, the day of Hust's injury, the vessel was being towed to port. He was ordered to go to the ship's locker in the forepeak of the second deck and bring out a mooring line to be used in towing. The electric bulb lighting the locker room had burned out and the room was dark. While crossing it to get the line, Hust fell through an unguarded hatch about twelve feet to the third deck. In landing he struck a steel manhole cover projecting some six inches above the deck, and incurred the injuries for which this suit was brought on September 24, 1943, in the Circuit Court for the County of Multnomah, State of Oregon.

The complaint alleged that Hust was respondent's employee, was injured through its negligence, and that the suit was brought pursuant to § 33 of the Merchant Marine Act of 1920. Trial before a jury brought a verdict and judgment for Hust. On appeal to the Supreme Court of Oregon the judgment was reversed and an order was entered for the cause to be remanded, with directions to enter judgment for the respondent notwithstanding the verdict. The Supreme Court held that, as a matter of law,[9] petitioner was an employee of the United States, not of respondent, and therefore he was not entitled to

---

[9] On special interrogatory the jury had found that Hust was respondent's employee on the date the injuries were incurred. The verdict was for $35,000, which the trial court indicated in its opinion was excessive in relation to the injuries incurred. But being of opinion that the question of liability should be settled by review, it declined to order remittitur and denied the motion for judgment non obstante veredicto, in effect reserving decision on the question of remittitur pending outcome of decision on appeal.

recover from it under the Jones Act for the injuries alleged and proved. 176 Ore. 662, 158 P. 2d 275. The importance of the question for the administration of the Act in application to persons situated similarly to the petitioner caused us to grant certiorari in order to review this ruling. 327 U. S. 771.

The Supreme Court of Oregon considered that the controlling question was whether Hust was respondent's employee when the injuries were incurred; and that "it must be assumed . . . that the case is governed by the rule of the common law" to determine this question and thus the outcome of the case. Accordingly it examined with great care the arrangements which had been made between respondent and the Government for operation of the Mark Hanna, with special reference to the provisions of the General Service Agreement [10] to which the Administration and respondent were parties. From this examination the court concluded that respondent was an agent of the Administration for only limited purposes, not including control, authority or principalship of the master and crew or responsibility for negligent occurrences taking place at sea and not attributable to the manner of discharging any duty of respondent while the

---

[10] Acting within its authority, cf. note 3, the Administration utilized these standard contracts for making arrangements with private steamship companies for the operation of many of these vessels. 46 C. F. R. (Cum. Supp.) § 306.44. They did not cover specific vessels. Under Article 1 of the agreement, the general agent agreed to "manage and conduct the business of vessels assigned to it by the United States from time to time."

In the instant case, the General Agent Service Agreement appears to have been given retroactive effect. The agreement states that it is "made as of October 19, 1941"; but that it was actually made as of that date is impossible, since the War Shipping Administration did not come into being until February 7, 1942. See note 1.

Some of the terms of the agreement are summarized in the text and notes 30, 40, 41.

vessel was in port.[11]  Hence, applying the common-law "control" test,[12] the court came to its conclusion that Hust was not respondent's employee as that relation is contemplated in the Jones Act.  The court also found that the so-called Clarification Act[13] in no way gave support to his view that he could recover from respondent under the Jones Act.[14]

It is around these questions and the effect for determining them of various authorities, particularly *Brady* v. *Roosevelt S. S. Co.*, 317 U. S. 575, that the controversy has revolved in the state courts and here.  In connection with the bearing of the Clarification Act, it is of some importance to note that Hust's injuries were sustained

[11] Cf. *Brady* v. *Roosevelt S. S. Co.*, 317 U. S. 575.  On the evidence of negligence presented here it was not shown that respondent had failed to perform any duty in outfitting the ship or otherwise in relation to the delinquencies alleged to have constituted causes of the injuries.  These, so far as the record discloses, were attributable entirely to occurrences taking place after the ship had last put to sea.

[12] See *Labor Board* v. *Hearst Publications*, 322 U. S. 111, notes 27 and 19 and authorities cited.

[13] See note 7.

[14] Petitioner relies on the following cases as supporting his position: *Gay* v. *Pope & Talbot*, 183 Misc. 162, 47 N. Y. S. 2d 16; *McCormick* v. *Moore-McCormack Lines*, 54 F. Supp. 399; *Moss* v. *Alaska Packers Assn.*, 160 P. 2d 224, 1945 A. M. C. 493; *Bast* v. *American-Hawaiian S. S. Co.*, 1945 A. M. C. 503; *Schaller* v. *Matson Navigation Co.*, 43 N. Y. S. 2d 566.

Respondent relies upon *Algiere* v. *Cosmopolitan Shipping Co.*, 185 Misc. 271, 56 N. Y. S. 2d 361, 1945 A. M. C. 906; *Pedersen* v. *Stockard S. S. Corp.*, 268 App. Div. 992, 51 N. Y. S. 2d 675, 1945 A. M. C. 23; *Nielsen* v. *American President Lines*, 50 N. Y. S. 2d 249, 1944 A. M. C. 1169; *Steele* v. *American South African Line*, 62 F. Supp. 636; *Baker* v. *Moore-McCormack Lines*, 57 F. Supp. 207; *Conlon* v. *Hammond Shipping Co.*, 55 F. Supp. 635; *Williams* v. *American Foreign S. S. Corp.*, 1946 A. M. C. 98; *Ferris* v. *American South African Line*, 1945 A. M. C. 1296; *Walsh's Case*, 1945 A. M. C. 747; *Murray* v. *American Export Lines*, 53 F. Supp. 861; *Fox* v. *Alcoa S. S. Co.*, 143 F. 2d 667.  See also Note (1946) 55 Yale L. J. 584.

only a few days before that Act became effective on March 24, 1943, and that it contained features relating to injuries like Hust's incurred between that date and October 1, 1941, retroactive in character.[15] It is, in part, concerning those features that argument has been most intense.

## I.

At the outset it is important to state just what the decision may mean in consequences for injured seamen and their dependents as well as for the Government.

The Jones Act was the culmination of a long struggle by seamen to secure more adequate relief in case of injury or death, incurred in the course of employment, than had been afforded by preexisting law.[16] We do not stop to review that history. But the history of the Jones Act since its enactment has been distinctive in that, at all subsequent times, seamen have opposed substituting for its provisions other forms of relief which have been tendered as being more in accord with modern trends of legislation for these matters.[17] Wisely or unwisely, they have steadfastly preferred the traditional remedy of jury trial for negligence to workmen's compensation based on liability without fault. By 1942, when the Government took over the merchant marine, that remedy had become a thoroughly established incident of the seaman's contract of employment, as much so as the historic relief afforded by the general maritime law for maintenance and cure

---

[15] See text *infra* at note 36.

[16] See *Warner* v. *Goltra,* 293 U. S. 155; *Gerradin* v. *United Fruit Co.,* 60 F. 2d 927.

[17] See *Warner* v. *Goltra, supra,* at 159–160 and the cited legislative history. In the hearings on the Clarification Act the seamen again opposed being brought within a compensation act. See statement of the National Maritime Union, Hearings before the Committee on the Merchant Marine and Fisheries on H. R. 7424, 77th Cong., 2d Sess., 30–31.

or maritime tort.[18]   It was one which attached to every seaman's contract.

Moreover, by § 1 of the Suits in Admiralty Act, like the Jones Act enacted in 1920 (41 Stat. 525, 46 U. S. C. § 741), arrest and seizure under judicial process were forbidden of vessels owned by the United States or a governmental corporation "or operated by or for the United States or such corporation"; and by § 2, in place of that right of seizure, "a libel in personam may be brought against the United States or against such [governmental] corporation" in cases where "if such vessel were privately owned or operated . . . a proceeding in admiralty could be maintained . . . ."

By the decision in *Johnson* v. *Fleet Corp.*, 280 U. S. 320, it was held that the remedies given by the Suits in Admiralty Act "are exclusive in all cases where a libel might be filed under it," that is, on "maritime causes of action covered by the Act." *Id.* at 327.

The *Johnson* ruling was made broadly to cover maritime causes of action which could be asserted in admiralty against the United States or governmental corporations and also against private operators for the Government.[19] *Fleet Corp.* v. *Lustgarten,* 280 U. S. 320, a companion

---

[18] The Jones Act is "an integral part of the maritime law . . . ." *Garrett* v. *Moore-McCormack Co.,* 317 U. S. 239, 248.

[19] Four different cases were disposed of in the single opinion, including in addition to the *Johnson* case *Fleet Corp.* v. *Lustgarten.* In that case the defendants were the Fleet Corporation and the Consolidated Navigation Company, which operated the vessel for the United States as agent pursuant to an agreement with the Shipping Board.   The suit was by a seaman injured in the ship's service allegedly for negligent failure of the defendants to furnish him a safe place to work and, further, furnish medical treatment and care after the injuries were incurred.   280 U. S. at 323.   The judgment for the plaintiff was reversed as to both defendants, no mention being made in the opinion of any difference between them for applicability of the Suits in Admiralty Act or otherwise.

case.  But in *Brady* v. *Roosevelt S. S. Co., supra,* the *Johnson* (*Lustgarten*) ruling was modified, in accordance with the obvious scope and purpose of the Act, to restrict the exclusiveness of the statutory remedy provided to causes asserted against the Government or governmental corporations.  The Act, it was held in effect, did not affect or exclude the seaman's rights, in admiralty or otherwise, against the private operator.  It merely substituted one remedy against the Government for what was, in substance though not technically, another against it, that is, the libel *in personam* provided by § 2 for the libel *in rem* taken away by § 1.[20]

Prior to 1942, therefore, the privately employed seaman had not only his remedy under the Jones Act, but also his rights under the general maritime law enforceable in admiralty or by various forms of proceedings elsewhere. But even more favorably situated, under the *Brady* ruling, was the seaman employed on vessels owned by the United States and operated for it by private companies under arrangements with the Fleet Corporation or the Maritime Commission.[21]  He had his exclusive remedy against the

---

[20] The Court held the *Johnson* ruling as to the Navigation Co. to be untenable, expressly stating "that the *Lustgarten* case so far as it would prevent a private operator from being sued under the circumstances of this case must be considered as no longer controlling."  317 U. S. at 578.  See notes 19, 22.

It is to be noted that, although the decedent in the *Brady* case for whose death the suit was brought was not a seaman, Lustgarten was.  In both cases the cause of action asserted was negligence or maritime tort.

[21] The United States Shipping Board was established by 39 Stat. 729 and 41 Stat. 989.  Section 11 of the earlier statute, 39 Stat. at 731, authorized the United States Shipping Board to establish government-controlled corporations, and pursuant to this provision the United States Shipping Board Merchant Fleet Corporation was set up.  See *Sloan Shipyards Corp.* v. *Merchant Fleet Corp.,* 258 U. S. 549, 564.  By Executive Order No. 6166, June 10, 1933, § 12, the

Government or the appropriate governmental corporation, under the Suits in Admiralty Act, for all causes of action which could be maintained in admiralty if the vessel on which he was employed had been privately owned or operated; and, moreover, under the *Brady* ruling he retained his rights under maritime law against the private company operating the vessel as agent for the Government.[22] Although never specifically decided here, this was held in *Carroll* v. *United States,* 133 F. 2d 690, to include not only general maritime rights such as the *Brady* case involved, but also recovery under the Jones Act. The *Carroll* case was decided flatly on authority of the *Brady* decision and the result was fully justified

---

functions of the United States Shipping Board, including those of the Emergency Fleet Corporation, were transferred to the Department of Commerce. Subsequently, by the Merchant Marine Act of 1936, 49 Stat. 1987, the United States Maritime Commission was created and the functions and duties of the former Shipping Board were transferred to it.

[22] Under the standard forms of contract utilized for these arrangements by the Shipping Board and later by the Maritime Commission, the private operator, though designated as "agent" somewhat in the manner of the Administration's General Service Agreement, undertook to "man the ship" along with other duties assumed. Under this provision the shipping company rather than the Government was regarded as the seaman's employer. Accordingly he had all the rights incident to the employment as against this operating "agent," notwithstanding the vessel was owned by the Government. The Suits in Admiralty Act was not intended to and did not touch those rights. As stated in the text, its remedies were added to them.

Because the General Service Agreement omits the explicit requirement that the "agent" shall "man the ship," it is strongly argued and the Oregon Supreme Court held that the relation between the respondent and the seaman here is basically different from that existing under the Maritime Commission's standard arrangements since, it is said, that omission destroys the employer-employee relation between the "agent" and the seaman, and creates another, entirely different, between the Government and the seaman. Cf. text *infra* at note 30.

both by its ruling and by the terms of the Suits in Admiralty Act.[23]

Now it is argued that this favored position was altogether inverted when the Government took over control of the entire merchant marine under its war powers in 1942. For it is maintained and the Oregon Supreme Court has held, in effect, that this transfer stripped seamen of many, if not all, of their protections, including the remedy under the Jones Act, for the duration of the war and six months.[24] True, the decision applies specifically only to Jones Act proceedings. But it is equally applicable to all other maritime rights and remedies dependent upon existence of the "employer-employee" relation, such as the right to maintenance and cure, etc. Whenever, in such cases, it might be found that technically the Government is the employer, the necessary result would be to remit the seaman to the "exclusive" right to sue under the procedure provided by the Suits in Admiralty Act. In short the combined effects of that Act and of the transfer of American shipping to governmental control, for the temporary period of the war, would be to confine merchant

[23] Cf. note 22. Effort has been made to restrict the scope of the *Brady* ruling, by regarding it as applicable only to the situation where the injury resulted from negligence of the private operating agency for which the Government or its sponsoring corporation would not be liable, in reliance upon the opinion's use of this situation to illustrate the fact that the Suits in Admiralty Act did not cut off general maritime rights and remedies against the operating agent. 317 U. S. at 581. But the ruling was broader both in rationalization and in result. The Court did not restrict possible recovery to such a situation in remanding the cause for determination of whether a cause of action had been made out.

[24] By which time the governmental pool presumably will have been dissolved, at any rate to the extent of returning many of the vessels comprising it to the private owners and operators. § 5, Clarification Act, 57 Stat. 51, 50 U. S. C. App. § 1295; Title IV, § 401, First War Powers Act, 55 Stat. 841, 50 U. S. C. App. § 621.

seamen altogether to suits under the Act, except in the cases of men employed on vessels under time-charter[25] and possibly as to injuries incurred by others through the general operating agent's failure to discharge some specific duty imposed by the General Service Agreement while the vessel is in port.[26]   With those possible exceptions the various rights of seamen, enforceable by various proceedings in admiralty and at law, in state and federal courts, are swept into one hopper, the suit against the Government or governmental corporation under the Suits in Admiralty Act.

Such a result quite obviously would resurrect the *Lustgarten* (*Johnson*) ruling to override, in practical effect, that of the *Brady* decision for the duration of the war. Nor would only the forum and the procedure to be followed be affected.   For, as the *Brady* opinion said of the *Lustgarten* ruling, the shorter limitations period of two years provided by the Suits in Admiralty Act would apply,[27] with the undoubted effect in many cases of barring recovery altogether.   With a variety of rights established in law and custom, the sudden shift of all relief, except in the comparatively infrequent instances mentioned above, to the single forum and remedy could not but bring widespread surprise and resulting failure of substantive rights.   Not only would wrong remedies be

---

[25] Cf. text following note 4 *supra*.   At the time of the Japanese surrender the total number of ships operated and owned by the War Shipping Administration was 4,363.   Of these, 537 were time-chartered from private operators and 405 were bareboat-chartered from private operators; 3,101 were operated under a General Service Agreement. See also note 1.

[26] Such as, e. g., failing to provide needed repairs or supplies, but not including any act attributable to negligence on the part of the master or other members of the crew.   Cf. note 23.

[27] 317 U. S. at 581, citing § 5 of the Act, and *Emergency Fleet Corp.* v. *Rosenberg Bros. & Co.*, 276 U. S. 202.   The period provided under the Jones Act, for instance, is three years.   45 U. S. C. § 56.

asserted only to discover the fact too late, as in this case and others in relation to which briefs *amicus curiae* have been filed.[28]   But at least some claimants, perhaps many, relying upon the longer period incorporated in the body of our law, would delay instituting suit beyond the shorter one allowed by the temporary expansion of the Suits in Admiralty Act to cover war conditions, and thus be trapped into loss of all remedy at a time when broad relief was needed more than ever.

There would be other uncertainties and complexities. Were respondent's position to prevail, a seaman would be forced to predict, before instituting his suit, whether at the end of the litigation it would turn out that the cause of action alleged should have been asserted against the Government or against the private operator.   Thus, it might often be difficult to foretell whether the negligence alleged to have caused the injury would be attributed ultimately, as the proof should turn out, to some act of the master or a member of the crew, in which event only the Government, not the operating agent, would be liable, or to some default of that agent in discharging its specially limited but various duties, in which case it and at least in some instances not the Government [29] would be responsible.   The only safe course for a claimant in doubt— and obviously many such situations might arise—would be to file two suits, one a libel *in personam* against the Government, the other an appropriate proceeding against

---

[28] One of the briefs *amicus curiae* states that the seaman's widow for whom it is filed has instituted suit against the shipping company within two years after her husband's death but that, inasmuch as no suit against the United States has been instituted within that period, if her cause of action against the shipping company will not lie, she will also be unable by virtue of the Statute of Limitations in the Suits in Admiralty Act to sue the United States.

[29] As in the case, suggested in the *Brady* opinion, in which the agent alone and not the principal would be liable.   317 U. S. at 581. See note 23.

the agent; and possibly even so the risk might remain that the division of remedies would result in loss of relief altogether.

In addition it should be mentioned that under the practice of the industry seamen frequently would move back and forth between vessels of the same owner moored side by side, from ships under time-charter to others under bareboat-charter to the Administration. With each such shift, under respondent's view of the law, responsibility for the seaman's injuries would shift from the agent to the Government or the other way around, with corresponding shuttling of remedy. The confusion thus resulting was one reason which led to adoption of the Clarification Act. S. Rep. No. 62, 78th Cong., 1st Sess., 5; H. Rep. No. 2572, 77th Cong., 2d Sess., 9, quoted *infra* at note 32.

These are at least some of the uncertainties and complexities which would result from acceptance of respondent's view. It is hardly too much to say that substantive rights would be lost in an incalculable number of cases by the disruption such an acceptance would bring for rights long settled. The result also would be to throw large additional numbers into confusion which in the end could only defeat many of them.

## II.

We may assume that Congress could authorize so vast a disturbance to settled rights by clear and unequivocal command. It is not permissible to find one by implication. *Brady* v. *Roosevelt S. S. Co., supra,* at 580. Here the disruption, if it has occurred, has done so only as an implied result of the conjunction of the Suits in Admiralty Act's provisions with the Government's emergency action in taking over the shipping industry for war purposes.

Apart from resurrecting the *Lustgarten* ruling in the face of the *Brady* reversal, this result could be reached

only by finding that Congress, or Congress and the President, intended to bring it about by the exercise of their powers to bring the industry under governmental control. No other legislation, or executive action, remotely could be thought to have that effect.

Certainly this was not the purpose of the Suits in Admiralty Act. As we have said, its effect was to expand, not to restrict, the seaman's rights, as *Brady* decided. Moreover, it was not an emergency measure, adopted to promote the war effort. It was normal, peacetime legislation, fitting into a settled scheme of private rights. There can be no inference from its terms or history that it was intended to displace that scheme entirely or in large part, in normal times or in the emergency of war. To give its letter this effect, because the war brought about the temporary transfer of the industry to governmental control, would be to pervert its whole purpose.

We are told, however, that the Jones Act applies by its specific terms only in the presence of the relation of employer to employee, to give the latter a remedy for the employer's negligence; and, since the effect of the General Service Agreement was to make the seaman technically an employee of the United States, the necessary result was to remit him exclusively to the Suits in Admiralty Act for remedy to enforce the substantive right given by the Jones Act.

The premise is not controlling. We may accept the Oregon court's conclusion that technically the agreement made Hust an employee of the United States for purposes of ultimate control in the performance of his work, although the meticulous differences in this respect between its terms and the corresponding provisions of the Maritime Commission's standard contract make it hardly more than dubious that respondent did not stand *pro*

*hac vice* as employer with the Government.[30]   But it does not follow from the fact that Hust was technically the Government's employee that he lost all remedies against the operating "agent" for such injuries as he incurred. This case, like *Labor Board* v. *Hearst Publications,* 322 U. S. 111, involves something more than mere application to the facts of the common-law test for ascertaining the vicarious responsibilities of a private employer for tortious conduct of an employee.

Here indeed is the respondent's fallacy, for it assumes the case would be controlled by the common-law rules of private agency.[31]   It is true these are applied in the normal

___

[30] See the concurring opinion of MR. JUSTICE DOUGLAS in this case; also note 10 *supra.* "These questions arise because of a *technical* status of such seamen as employees of the United States by virtue of their employment through the War Shipping Administration for service on such vessels." S. Rep. No. 62, 78th Cong., 1st Sess., 5. (Emphasis added.) The chief differences between the relationship of the managing agent in the *Brady* case to the seamen and the relationship of the respondent to the seamen are, as set out in the contracts, as follows:

Under the agreement in the *Brady* case the managing agent agreed to man the vessels. The licensed officers and chief steward, however, were subject to the approval of the owner, the United States, which also had the right to remove any employees "if it shall have reason to be dissatisfied."

Under the General Agent Service Agreement the shipping company does not agree to man the vessel. It agrees to procure the master, subject to the approval of the United States. The master is an agent and employee of the United States and has complete responsibility and authority with respect to the navigation and management of the vessel. The general agent agrees to procure officers and men through the usual channels and in accordance with the customary practices of commercial operators and to make them available to the master. It is provided that officers and members of the crew "shall be subject only to the orders of the Master."

[31] See text *supra* preceding note 10. The opinion stated: "We think it must be assumed in determining whether the plaintiff was

everyday applications of the Jones Act. But in those situations this is done to determine who comes within, who without, the covered class in the Act's normal operation, not to exclude that class entirely or in large part. Here the application is made to defeat the Act for all except the smaller number of men whom it was enacted to protect. No such application of the common-law "control" test can be justified in this temporary situation unless by inversion of that wisdom which teaches that "the letter killeth, but the spirit giveth life."

Not always does the law proceed in disregard of that truth. There was nothing to prevent Congress or the President, acting in exercise of their authority, from shifting the technical relation of employer and employee from the general agent to the Government, for purposes relevant to ultimate wartime control of marine employees, without at the same time disrupting their normally applicable rights and remedies. On the contrary, there was every reason why the change should be made without that consequence. No presumption can be indulged that any purpose existed to take away those protections when they were needed more than ever, nor any that so great a disruption would be made for only the emergency of the war period. Nothing in the Jones Act, the Suits in Admiralty Act, or in the War Powers Act of 1941 and the Executive Orders by which the industry's transfer was accomplished compels such a conclusion.

## III.

Confirmation of this is furnished by the legislative history of the Clarification Act and by its retroactive provisions relative to the seaman's rights, including remedies

---

an employee of the defendant that the case is governed by the rule of the common law." 176 Ore. 662, 669, 158 P. 2d 275, 278.

on account of personal injury and death. Indeed one primary occasion for enacting the Clarification Act was to save the seaman's rights in these respects rather than to take them away.[32]

It is true there was great concern for fear that those rights had been lost or seriously attenuated by the transfer to governmental control, particularly during the earlier stages of congressional consideration when the *Brady* decision had not removed the large cloud cast over them by the *Lustgarten* ruling. Nor did *Brady* remove all of the doubt in the minds of those sponsoring the bill, as

---

[32] "The basic scope and philosophy of the measure is to preserve private rights of seamen while utilizing the merchant marine to the utmost for public wartime benefit. Except in rare cases the ships themselves are being operated as merchant vessels, and are therefore subject to the Suits in Admiralty Act in all respects. Granting seamen rights to sue under that act is therefore entirely consistent with the underlying pattern of the measure." S. Rep. No. 62, 78th Cong., 1st Sess., 11.

"Present-day operating conditions often make uncertain whether the vessel is a merchant or a public vessel. As a consequence the aforementioned rights [rights under the Jones Act and the general maritime law] of such seamen are frequently in doubt. In addition to these rights which, at times, are uncertain for the reasons mentioned, the seamen who are employees of the United States probably have rights under the United States Employees' Compensation Act in the event of injury or death. Such compensation benefits are not presently enjoyed by seamen under private employment. Thus vital differences in these rights are made to depend upon whether the seaman happens to be employed aboard a vessel time-chartered to the War Shipping Administration or owned by or bareboat-chartered to the War Shipping Administration. Since seamen constantly change from one vessel to another, their rights for death, injury, or illness also constantly change depending upon the relationship of the War Shipping Administration to the vessel. This fluctuation and lack of uniformity of rights leads to dependency of vital rights upon chance with a result of confusion and inequities. The bill is designed to remove this confusion and these inequities." H. Rep. No. 2572, 77th Cong., 2d Sess., 9.

the committee reports during the later stages of consideration disclose.[33] Hence, to make certain that the seamen would have at least the remedy provided by the Suits in Admiralty Act for enforcement of their substantive rights, as well as to take care of other important matters not affecting them,[34] the bill proceeded to enactment.

We need not determine in this case whether prospectively the Clarification Act affected rights of the seaman against the operating agent and others, or simply made sure that his rights were enforceable against the Government. We make no suggestion in that respect. For this case, on the facts, is not governed by the statute's prospective operation.[35] It may be noted however that, if

[33] See notes 36 and 37 and text.

[34] See §§ 3 and 4 of the Clarification Act. These relate to payment of just compensation for vessels requisitioned, war risk insurance, limitation of liability for the War Shipping Administration, and other miscellaneous matters. Section 1 of the Act provided that the seamen "because of the temporary wartime character of their employment by the War Shipping Administration" should not be considered as officers or employees of the United States for the purposes of various specified acts, including the United States Compensation Act.

[35] The provision principally affecting rights like those now in question was § 1: "(a) officers and members of crews (hereinafter referred to as 'seamen') employed on United States or foreign flag vessels as employees of the United States through the War Shipping Administration shall, with respect to (1) laws administered by the Public Health Service and the Social Security Act, as amended by subsection (b) (2) and (3) of this section; (2) death, injuries, illness, maintenance and cure, loss of effects, detention, or repatriation, or claims arising therefrom not covered by the foregoing clause (1); and (3) collection of wages and bonuses and making of allotments, have all of the rights, benefits, exemptions, privileges, and liabilities, under law applicable to citizens of the United States employed as seamen on privately owned and operated American vessels. . . . Any claim referred to in clause (2) or (3) hereof shall, if administratively disallowed in whole or in part, be enforced pursuant to the provisions

respondent's contention were the law, the provisions of § 1, authorizing enforcement of the seaman's substantive rights for injury, maintenance and cure, etc., by the Suits in Admiralty Act remedy, would do no more than reaffirm what the latter Act had provided all along.

The Clarification Act, however, is not without important bearing for solution of the problem this case presents. For whatever the effect of its prospectively operating provisions upon the seaman's rights as against others than the Government, the bill in its final form contained a provision designed and effective to prevent the loss of such rights as petitioner now asserts.

Section 1 of the Act contains the following provision which is in terms applicable to this case:

> "Any claim, right, or cause of action of or in respect of any such seaman accruing on or after October 1, 1941, and prior to the date of enactment of this section may be enforced, and upon the election of the seaman or his surviving dependent or beneficiary, or his legal representative to do so shall be governed,

---

of the Suits in Admiralty Act, notwithstanding the vessel on which the seaman is employed is not a merchant vessel within the meaning of such Act. Any claim, right, or cause of action of or in respect of any such seaman accruing on or after October 1, 1941, and prior to the date of enactment of this section may be enforced, and upon the election of the seaman or his surviving dependent or beneficiary, or his legal representative to do so shall be governed, as if this section had been in effect when such claim, right, or cause of action accrued, such election to be made in accordance with rules and regulations prescribed by the Administrator, War Shipping Administration. Rights of any seaman under the Social Security Act, as amended by subsection (b) (2) and (3), and claims therefor shall be governed solely by the provisions of such Act, so amended. When used in this subsection the term 'administratively disallowed' means a denial of a written claim in accordance with rules or regulations prescribed by the Administrator, War Shipping Administration. . . ." 57 Stat. 45.

as if this section had been in effect when such claim, right, or cause of action accrued, such election to be made in accordance with rules and regulations prescribed by the Administrator, War Shipping Administration." [36]

One obvious purpose of this provision was to extend retroactively to the seaman the benefit of the assured remedy against the Government given by § 1. But equally obvious is the intent to save such other rights as the seaman may have had and to give him an election between enforcing them in the usual manner and asserting them in a suit against the United States in the manner provided by § 1.

---

[36] H. Rep. No. 2572, 77th Cong., 2d Sess., 15, states: "Special provision is made with respect to rights and with respect to claims and causes involved in section 1 (a) (2) and (3) which may have accrued on or after October 1, 1941, and prior to the date of enactment of the measure. Under this provision the seaman or other claimant may elect to enforce the claim as if section 1 had been in effect at the time the claim accrued. In exercising this option the claimant would, of course, accept the incidental consequences of such election, would be prevented from proceeding to secure double recovery under other procedure without regard to section 1, and would be bound by the applicable statutes or principles of limitations.

"Inasmuch as certain vessel operations on account of the Government were undertaken prior to the establishment of the War Shipping Administration by or through the Maritime Commission, the provisions of section 1 and all amendments therein are made applicable to the United States Maritime Commission with respect to the period beginning October 1, 1941, to the time of taking office of the Administrator, War Shipping Administration (February 11, 1942)."

And in S. Rep. No. 1813, 77th Cong., 2d Sess., 6, it was stated: "Section 1 makes full provision with respect to rights and claims which may have accrued during the early months of the war or its imminence, and prior to the enactment of the bill. This provision is necessary in view of vessel operations by or through the Maritime Commission in the period prior to taking office of the Administrator, War Shipping Administration (February 11, 1942)."

Uncertain in scope as the effects of the *Brady* decision were regarded to be, they were clearly recognized as holding that the seaman had rights against private operators arising after the transfer of governmental control.[37] Respondent's view of the law would nullify the election given. For in that view, even before the Clarification Act was adopted, the seaman's exclusive remedy for injuries incurred after the transfer was by suit under the Suits in Admiralty procedure. But § 1 expressly gives election between that identical remedy, as conferred by the Clarification Act, and preexisting remedies. It is too obvious to require statement that if the seaman's only remedy for injuries incurred before the Clarification Act became effective was under the Suits in Admiralty Act, as respondent contends, the election given by § 1 becomes no election whatever.

It is true that Congress did not enumerate the specific rights which it considered seamen to have prior to the Clarification Act and after the industry's transfer to governmental control. To have done so, in view of its own uncertainty in this respect, including the effects of the *Brady* decision, would have been hazardous. The intent is clear, nevertheless, in the retroactive provision to preserve all such rights and remedies as may have remained in existence unaffected by the transfer. For the reasons we have stated we think these included the remedy provided by the Jones Act as well as the substantive right.

The mere fact that the terms of the standard agreement were changed to omit the provision for manning the ship and substitute the provisions relating to employees con-

---

[37] Cf. S. Rep. No. 62, 78th Cong., 1st Sess., 8, 17; H. Rep. No. 107, 78th Cong., 1st Sess., 5, 29. These reports construe the effects of the *Brady* decision more narrowly than we have done in this case and than the decision justifies.

tained in the General Service Agreement was not, in these circumstances, enough to deprive seamen of that remedy. We do not think either Congress or the President intended to bring about such a result by the transfer of the industry to temporary governmental control. If this made them technically and temporarily employees of the United States, it did not sever altogether their relation to the operating agent, either for purposes of securing employment or for other important functions relating to it.[38] Nor did it disrupt the long-established scheme of rights and remedies provided by law to secure in various ways the seaman's personal safety, either to deprive him of those rights altogether [39] or to dilute or reduce them to the single mode of enforcement by the Suits in Admiralty Act procedure.

This result is in accord with the spirit and policy of other provisions of the General Service Agreement. The managing agent selected the men, and did so by the usual procedure of dealing with the duly designated collective bargaining agent. It delivered them their pay, although from funds provided by the Government. It was authorized specifically to pay claims not only for wages, but also for personal injury and death incurred in the course of employment, for maintenance and cure, etc.[40] It was

---

[38] See notes 39 and 40.

[39] On respondent's contention it is assumed that, before the Clarification Act took effect, the Government could be sued under the Suits in Admiralty Act for recovery in this and similar cases. Whether and how far that Act would have permitted suits by seamen injured in the course of their employment prior to the Clarification Act's effective date need not be determined in this case.

[40] "To the extent not recovered from insurance, the United States shall also reimburse the General Agent for all crew expenditures, accruing during the term hereof, in connection with the vessels hereunder, including, without limitation, all disbursements for or on

responsible for keeping the ship in repair and for providing the seaman's supplies. For all of these expenditures not covered by insurance the contract purported expressly to provide for indemnity from the Government.[41]

With so much of the former relation thus retained and so little of additional risk thrown on the operating agent, it would be inconsonant not only with the prevailing law, but also with the agreement's spirit and general purpose to observe and keep in effect the seaman's ordinary and usual rights except as expressly nullified, for us to rule that he was deprived of his long-existing scheme of remedies and remitted either to none or to a doubtful single mode of relief by suit against the Government *in personam* in admiralty. Our result also is in accord with the general policy of the Government and of the War Shipping Administration that those rights should be preserved and

account of wages, extra compensation, overtime, bonuses, penalties, subsistence, repatriation, travel expense, loss of personal effects, *maintenance, cure,* vacation allowances, *damages or compensation for death or personal injury or illness,* and insurance premiums, required to be paid by law, custom, or by the terms of the ship's articles or labor agreements, or by action of the Maritime War Emergency Board . . . ." (Emphasis added.)

The General Agent Service Agreement provides that officers and members of the crew "shall be paid in the customary manner with funds provided by the United States hereunder." The proof at trial showed that petitioner was paid his wages by the ship's purser, the money being in envelopes bearing the name of respondent.

[41] See note 40. The General Agent Service Agreement also provides that the United States shall procure insurance against all insurance risks "of whatsoever nature or kind relating to the vessels assigned hereunder" and "shall defend, indemnify and save harmless the General Agent against and from any and all loss, liability, damage and expense . . . to the extent not covered or not fully covered by insurance."

Compare the provisions of §§ 2 and 3 of the Clarification Act with respect to insurance and compensation as they affect seamen.

maintained, as completely as might be possible under existing law, against impairment due to the transfer.[42]

A further word remains to be said about the legislative history of the Clarification Act in general. Both parties have relied strongly on excerpted portions thought to support their respective views. As is true with respect to all such materials, it is possible to extract particular segments from the immediate and total context and come out with road signs pointing in opposite directions. We do not undertake to illustrate the contrast from the history in this case. It can be said, however, with assurance that, taken as a whole, the committee reports in Congress, together with appended documents from various affected agencies and officials, are amorphous in relation to the crucial problem presented in this case. All of them give evidence of concern that rights may have been lost or rendered uncertain by the transfer, and that action should be taken by Congress to preserve the substantive rights intact and remedial ones at the least by extension of the Suits in Admiralty Act to cover them.

The entire history will be read in vain, however, for any clear expression of intent or purpose to take away rights, substantive or remedial, of which the seaman had not already been deprived, actually or possibly, by virtue of the transfer. Whether or not this conserving intent was made effective in the prospectively operating provisions of the Act, it is made clear beyond question in the retroactive ones. Congress was confessedly in a state of uncertainty. But, being so, it nevertheless had no purpose to destroy rights already accrued and in force, whether substantive or remedial in character. Its object, in this respect at the least, was to preserve them and at the same time to provide an additional assured remedy

[42] See notes 32, 40, 41.

in case what had been preserved might turn out for some reason to be either doubtful or lost.

The judgment is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

*Reversed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK agrees, concurring.

While I have joined in the opinion of the Court, I add a few words to indicate that the result we have reached is consonant with the traditional rules of liability.

A charterer who obtains exclusive possession and management of the vessel from the owner is owner *pro hac vice* and subject to the responsibilities of ownership for the duration of the charter period. *Reed* v. *United States,* 11 Wall. 591, 600–601; *Leary* v. *United States,* 14 Wall. 607, 610; *United States* v. *Shea,* 152 U. S. 178. The question whether exclusive possession and management of the vessel have been transferred to the charterer turns on the facts of each case—a construction of the agreement between the parties, and the conduct of the parties under the arrangement. *United States* v. *Shea, supra,* pp. 189–191.

This agreement provides that the General Agent is appointed "to manage and conduct the business of vessels assigned to it by the United States from time to time." Art. 1. The General Agent promises "to manage and conduct the business for the United States" of such vessels as have been "assigned to and accepted by the General Agent." Art. 2. The United States has the power on specified notice to terminate the agreement and "to assume control forthwith" of the vessels. Art. 11. On

termination "all vessels and other property of whatsoever kind then in the custody of the General Agent" are to be "immediately turned over to the United States." Art. 12. The fair intendment of these provisions is that possession of the vessels passes to the General Agent under the agreement.

Management of the vessels also is granted the General Agent. It is to "maintain the vessels in such trade or service as the United States may direct." Art. 3. It is the one to "equip, victual, supply and maintain the vessels." *Id.* It shall "procure the Master of the vessels . . . subject to the approval of the United States." *Id.* It shall "procure and make available to the Master for engagement by him the officers and men required by him to fill the complement of the vessel." *Id.* The officers and men are to be "procured by the General Agent through the usual channels and in accordance with the customary practices of commercial operators and upon the terms and conditions prevailing in the particular service or services in which the vessels are to be operated from time to time." *Id.* The General Agent shall "arrange for the repair of the vessels." Art. 14.

All of these things are done, to be sure, for the account of the United States. The agreement, moreover, specifically provides that the master is "an agent and employee of the United States." Art. 3. The officers and crew are subject "only to the orders of the Master." Art. 3. And the shipping articles which were entered into were between the master and the crew. From this it is argued that the members of the crew were employees of the United States, not of the General Agent or operator.

The shipping articles, however, are by statute required to be an engagement between the master and the crew. 38 Stat. 1168, 46 U. S. C. § 713. The responsibility of the master for the operation of the vessel is, moreover, traditional. See *United States* v. *Farnham,* 25 Fed. Cas.

No. 15,071, pp. 1042, 1045.  So the case for respondent comes down essentially to the provision in the agreement that the master is the agent and employee of the United States.

If the parties to a contract could by the choice of a label determine these questions of responsibility to third persons the problem would be simple.  But the conventions of the parties do not determine in the eyes of the law the rights of third persons.  *Brady* v. *Roosevelt S. S. Co.,* 317 U. S. 575, 583.  The Court dealt with one species of this problem in *Knights of Pythias* v. *Withers,* 177 U. S. 260, where an insurance policy designated the person to whom premiums were paid as the agent of the insured, not the agent of the insurer.  The Court said, p. 268:

> "The reports are by no means barren of cases turning upon the proper construction of this so-called 'agency clause,' under which the defendant seeks to shift its responsibility upon the insured for the neglect of Chadwick to remit on the proper day.  In some jurisdictions it is held to be practically void and of no effect; in others, it is looked upon as a species of wild animal, lying in wait and ready to spring upon the unwary policyholder, and in all, it is eyed with suspicion and construed with great strictness.  We think it should not be given effect when manifestly contrary to the facts of the case, or opposed to the interests of justice."

This problem of liability to third persons is resolved by determining whose enterprise the particular venture was.  The fact that the parties say it is the enterprise of one, not the other, is not decisive.  Control in the operation and management of the business, as distinguished from general supervision, is the customary test.  I look in vain to find in the present arrangement any evidence that the owner acted as the manager of this business.  Respondent, the General Agent, had a most substantial measure of control over the operations of the

vessels. Its *de facto* control was no whit less or more whether the master were called the agent of the owner or its own agent. The case is not one where an agent attends only to the business of a vessel as distinguished from its manning or physical operation or control. Respondent maintains the vessels in the broadest sense and procures the master and crew. In the *Brady* case the operator was "to man, equip, victual, supply and operate the vessels." 317 U. S. p. 576. The same was true in *Quinn* v. *Southgate Nelson Corp.,* 121 F. 2d 190, 191. But the difference in words between the agreements in those cases and the present one does not, on a view of the entire situation, mark a difference in functions of the private operator. It is, indeed, difficult to see how the functions of the private operator were in any way changed under this agreement from what they were in those other two cases. Respondent, of course, accounts for its operations to the United States. The United States reimburses it for all of its expenditures, including the wages of the crew. But it is immaterial that the owner provides the entire crew and pays their wages. A charterer who has control of the operations is owner *pro hac vice. Hills* v. *Leeds,* 149 F. 878. So far as this record reveals, the operator performed all of the functions which it performed in the *Brady* and *Quinn* cases. There is here no taking over of additional functions by the owner. The arrangement is clothed in different garb. But it is the private operator who manages and controls the physical operation. The powers reserved to the owner were general supervisory powers adequate for the exigencies of the wartime conditions which prevailed. But they did not detract from the powers of physical operation granted respondent.

The fact that we have here no more than a change in form not in substance is borne out by collateral phases

of this undertaking. The compensation of respondent is not to be less than "the amount of earnings which the General Agent would have been permitted to earn under any applicable previously existing bareboat charters,. preference agreements, commitments, rules or regulations of the United States Maritime Commission until the earliest termination date permissible thereunder as of March 22, 1942." Art. 5. The United States agrees to reimburse respondent for "damages or compensation for death or personal injury or illness" required to be paid. Art. 7. It also agrees to reimburse respondent for payments made by respondent to a pension fund for officers and members of the crew, as well as for "social security taxes which the General Agent is or may be required to pay on behalf of the officers and crew of said vessels as agent or otherwise." *Id.*

These provisions all suggest, as the relationship of the parties bears out, that the United States was the underwriter of the financial risks of the venture,[1] the operator continuing, as it always had, to perform the managerial functions. These managerial functions constitute control, decisive of liability in this case. There was no demise. But the form of the agreement is not important if the functions of the operator were those of an owner *pro hac vice*. I think that is the true condition which existed here.

At common law respondent would be the principal, for the business of managing and operating the vessel was its business. It was therefore the employer and responsible for this personal injury claim.

MR. JUSTICE REED, dissenting.

Petitioner, Hust, a fireman and watertender on the S. S. Mark Hanna, brought an action in an Oregon Circuit

---

[1] See S. Rep. No. 898, 74th Cong., 1st Sess., pp. 39–40.

Court[1] against the respondent, the Moore-McCormack Lines, Inc. The suit was under the Merchant Marine Act of 1920, the Jones Act, § 33.[2] It sought damages against the respondent as employer. As § 33 shows on its face, a seaman has the advantages of the Federal Employers' Liability Act only against his employer.[3] The judgment of the Supreme Court of Oregon denying petitioner the right to recover in this action would then be correct unless the respondent is petitioner's employer or unless congressional legislation since the Merchant Marine Act grants petitioner a right of recovery against respondent even though the employer-employee relationship does not exist.

The S. S. Mark Hanna, a Liberty ship, was owned by the United States. So far as appears from the record, it had never belonged to anyone else. Its operation was under the direction of the War Shipping Administration. In order to carry out its responsibilities, the Administration employed respondent as its General Agent to conduct the business of certain ships assigned to respondent for handling. From the excerpts from the contract, set out

---

[1] See *Garrett* v. *Moore-McCormack Co.*, 317 U. S. 239, 245.

[2] 41 Stat. 1007, 46 U. S. C. § 688:

"Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; . . ."

[3] *Panama R. Co.* v. *Johnson*, 264 U. S. 375, 389; *Nolan* v. *General Seafoods Corp.*, 112 F. 2d 515, 517; *The Norland*, 101 F. 2d 967; *Baker* v. *Moore-McCormack Lines*, 57 F. Supp. 207, 208; *Eggleston* v. *Republic Steel Corp.*, 47 F. Supp. 658, 659; *Gardiner* v. *Agwilines, Inc.*, 29 F. Supp. 348.

Compare *Robinson* v. *Baltimore & Ohio R. Co.*, 237 U. S. 84, 94:

"We are of the opinion that Congress used the words 'employé' and 'employed' in the statute in their natural sense, and intended to describe the conventional relation of employer and employé."

*Hull* v. *Philadelphia & Reading R. Co.*, 252 U. S. 475.

below, we think it clear that this was a conventional agency contract under which respondent managed certain matters connected with the ship for the United States. We think it clear, as did the Supreme Court of Oregon, that so far as the crew is concerned the respondent only procured the members, such as Hust, and made them available to the Master, a United States agent, for employment by said Master for the account of the United States.[4] Such a contract makes the United States the

---

[4] "Witnesseth: That in consideration of the reciprocal undertakings and promises of the parties herein expressed:

"Article 1. The United States appoints the General Agent as its agent and not as an independent contractor, to manage and conduct the business of vessels assigned to it by the United States from time to time.

"Article 2. The General Agent accepts the appointment and undertakes and promises so to manage and conduct the business for the United States, in accordance with such directions, orders, or regulations as the latter has prescribed, or from time to time may prescribe, and upon the terms and conditions herein provided, of such vessels as have been or may be by the United States assigned to and accepted by the General Agent for that purpose.

"Article 3A. To the best of its ability, the General Agent shall for the account of the United States:

.        .        .        .

"(d) The General Agent shall procure the Master of the vessels operated hereunder, subject to the approval of the United States. The Master shall be an agent and employee of the United States, and shall have and exercise full control, responsibility and authority with respect to the navigation and management of the vessel. The General Agent shall procure and make available to the Master for engagement by him the officers and men required by him to fill the complement of the vessel. Such officers and men shall be procured by the General Agent through the usual channels and in accordance with the customary practices of commercial operators and upon the terms and conditions prevailing in the particular service or services in which the vessels are to be operated from time to time. The officers and members of the crew shall be subject only to the orders of the

employer under the Merchant Marine Act, not the Master and not respondent, the General Agent. This is an action under the Merchant Marine Act and the question of liability of the respondent for any negligence under any other statute or rule of law, admiralty or otherwise, is not before us.

Since 1920, employees of the United States upon merchant vessels of the United States have had a right of action in admiralty against the vessels in all cases where the employees would have had a right if the vessel were privately owned or operated. This came from § 2 of the Suits in Admiralty Act.[5] This right of action was enforceable exclusively in admiralty.[6] There was no right to a trial and assessment of damages by a jury.

When the War Shipping Administration became the operator of practically the entire American merchant marine, doubts sometimes arose as to whether a particular vessel was a "merchant" vessel, operated by the United States or not. Therefore to clarify this situation and to assure all "employees of the United States through the War Shipping Administration" all "rights" for "injuries" applicable to seamen "employed on privately owned and operated American vessels," Congress enacted an act to clarify the law relating to functions of the Administra-

---

Master. All such persons shall be paid in the customary manner with funds provided by the United States hereunder."

[5] 41 Stat. 525–26:

"SEC. 2. That in cases where if such vessel were privately owned or operated, or if such cargo were privately owned and possessed, a proceeding in admiralty could be maintained at the time of the commencement of the action herein provided for, a libel in personam may be brought against the United States or against such corporation, as the case may be, provided that such vessel is employed as a merchant vessel or is a tug boat operated by such corporation. . . ."

[6] *Fleet Corp.* v. *Rosenberg Bros.*, 276 U. S. 202; *Johnson* v. *Fleet Corp.*, 280 U. S. 320.

tion.  Provisions from the first section which are important here are set out below.[7]

As will be seen by an examination of the reports of the House and Senate [8] in connection with the specific requirement of the first section, *supra,* for enforcement of these rights, Congress declared its purpose in no uncertain terms to grant the power to enforce these rights only through the Suits in Admiralty Act.  That is, the seaman could not submit his claim to a jury.[9]  It will be noted that the words "right" and "status" are used with care, so that

---

[7] 57 Stat. 45–46:

"That (a) officers and members of crews (hereinafter referred to as 'seamen') employed on United States or foreign flag vessels as employees of the United States through the War Shipping Administration shall, with respect to . . . (2) death, injuries, illness, . . . have all of the rights, benefits, exemptions, privileges, and liabilities, under law applicable to citizens of the United States employed as seamen on privately owned and operated American vessels. . . . Any claim referred to in clause (2) or (3) hereof shall, if administratively disallowed in whole or in part, be enforced pursuant to the provisions of the Suits in Admiralty Act, notwithstanding the vessel on which the seaman is employed is not a merchant vessel within the meaning of such Act.  Any claim, right, or cause of action of or in respect of any such seaman accruing on or after October 1, 1941, and prior to the date of enactment of this section may be enforced, and upon the election of the seaman or his surviving dependent or beneficiary, or his legal representative to do so shall be governed, as if this section had been in effect when such claim, right, or cause of action accrued, such election to be made in accordance with rules and regulations prescribed by the Administrator, War Shipping Administration. . . . "

[8] S. Rep. No. 62, 78th Cong., 1st Sess.; H. Rep. No. 107, 78th Cong., 1st Sess.

[9] This purpose is made plain by a few excerpts from the reports. S. Rep. No. 62, 78th Cong., 1st Sess., pp. 5–6, 11, 14:

"Seamen employed as Government employees on vessels owned by, or bareboat-chartered to, the War Shipping Administration are sometimes precluded from enforcing against the United States the rights and benefits in case of death, injury, illness, detention, and so on that would be available to them if employed by private employers, except under the Suits in Admiralty Act.  If they were private employees, rights to redress for death, injury, or illness could be prosecuted under the Jones Act and the general maritime law.  These same rights may be asserted against the

it is plain Congress intended to give all Administration seamen rights under the Merchant Marine Act and remedies under the Suits in Admiralty Act.

United States as the employer under the Suits in Admiralty Act providing the vessel involved is a merchant vessel. In case of public vessels the seaman must rely for compensation upon the Administrator's policy recognizing contractual liability which this legislation recognizes. Present-day operating conditions often make uncertain in some cases whether the vessel is a merchant or a public vessel. As a consequence, even though the vessels are generally merchant vessels and not public vessels, there are some cases in which the aforementioned rights of such seamen are in doubt. In addition to these rights which, at times, are uncertain for the reasons mentioned, the seamen who are employees of the United States probably have rights under the United States Employees' Compensation Act in the event of injury or death. Such compensation benefits are not presently enjoyed by seamen under private employment. Thus vital differences in these rights are made to depend upon whether the seaman happens to be employed aboard a vessel time-chartered to the War Shipping Administration or owned by or bareboat-chartered to the War Shipping Administration. Since seamen constantly change from one vessel to another, their rights for death, injury, or illness also constantly change, depending upon the relationship of the War Shipping Administration to the vessel. This fluctuation and lack of uniformity of rights leads to dependency of vital rights upon chance with a result of confusion and inequities. The bill is designed to remove this confusion and these inequities. The bill does not affect seamen employed on vessels time-chartered to the War Shipping Administration where the vessels are supplied with crews employed by the company from which the vessel is chartered. As to them their status and the status of the Government employees mentioned will be made uniform.

. . . . .

". . . They will continue to have the right to indemnity through court action for injury resulting from unseaworthiness of the vessel or defects in vessel appliances, and they (and their dependents) will have the right to action under the Jones Act (1920) for injury or death resulting from negligence of the employer. Such seamen will have the right to enforce claims for these benefits according to the procedure of the Suits in Admiralty Act, except that claims with respect to social-security benefits shall be prosecuted in accordance with the procedure provided in the social-security law. . . .

. . . . .

"The provision of the Suits in Admiralty Act that suit lies thereunder only if the ship involved is employed as a merchant vessel or a tugboat is waived for the purposes of section 1 so

As there might be instances where a seaman was an employee of the Administration but his boat was not a merchant vessel of the United States, the Clarification

that the claim may be enforced regardless of the nature of the vessel on which the seaman is serving as an employee of the War Shipping Administration. To prevent unnecessary or premature litigation against the United States, it is required that before suit there shall be an administrative disallowance of the same in accord with rules or regulations to be prescribed by the Administrator, War Shipping Administration."

H. Rep. No. 107, 78th Cong., 1st Sess., pp. 3, 21:

"The basic scope and philosophy of the measure is to preserve private rights of seamen while utilizing the merchant marine to the utmost for public wartime benefit. Except in rare cases the ships themselves are being operated as merchant vessels, and are therefore subject to the Suits in Admiralty Act. Granting seamen rights to sue under that act is therefore entirely consistent with the underlying pattern of the measure. This should follow even in the extraordinary case where vessels might otherwise technically be classed as public vessels.

. . . . .

"The various rights and remedies under statute and general maritime law with respect to death, injury, illness, and other casualty to seamen, have been rather fully set forth hereinabove. Under clause 2 of section 1 (a) these substantive rights would be governed by existing law relating to privately employed seamen. The only modification thereof arises from the remedial provision that they shall be enforced in accordance with the provisions of the Suits in Admiralty Act. This procedure is appropriate in view of the fact that the suits will be against the Government of the United States. In such a suit no provision is made for a jury trial as may otherwise be had in a proceeding such as one under the Jones Act for reasons set forth in the letter of the Attorney General (September 14, 1942). The provision of the Suits in Admiralty Act that suit lies thereunder only if the ship involved is employed as a merchant vessel or a tugboat is waived for the purposes of section 1 so that the claim may be enforced regardless of the nature of the vessel on which the seaman is serving as an employee of the War Shipping Administration. To prevent unnecessary or premature litigation against the United States, it is required that before suit there shall be an administrative disallowance of the same in accord with rules or regulations to be prescribed by the Administrator, War Shipping Administration."

The desirability of a jury trial was commented upon by a representative of the National Maritime Union and the Attorney General in reply. See Hearings on H. R. 7424, House Committee on Merchant Marine & Fisheries, 77th Cong., 2d Sess., pp. 30–33.

Act of March 24, 1943, was made retroactive to October 1, 1941.[10] Probably other compensation for injuries may have existed prior to the enactment of this Act.

It is said by the Court that if a seaman employed by the United States is limited to the remedies of the Suits in Admiralty Act for recovery in tort, the holding in *Emergency Fleet Corp.* v. *Lustgarten,* 280 U. S. 320, is restored as a rule of law. The *Lustgarten* case was overruled by *Brady* v. *Roosevelt S. S. Co.,* 317 U. S. 575, 578. We think that this misconceives the effect of the *Brady* case. We do not think the requirement that seamen, employees of the United States, must seek their remedy against their employer under the Suits in Admiralty Act has any relation to the *Lustgarten* or *Brady* cases.

Lustgarten, a seaman, sought recovery at law for a tort against the Navigation Company, an agent of the United States. It was held that he could only recover under

---

[10] S. Rep. No. 62, 78th Cong., 1st Sess., p. 13:

"Inasmuch as certain vessel operations on account of the Government were undertaken prior to the establishment of the War Shipping Administration by or through the Maritime Commission, the provisions of section 1 and all amendments therein are made applicable to the United States Maritime Commission with respect to the period beginning October 1, 1941, to the time of taking office of the Administrator, War Shipping Administration (February 11, 1942). To avoid administrative confusion and uncertainty as to the exact status of employment of seamen employed on War Shipping Administration vessels, it is provided that seamen employed through that agency shall be included under the provisions of section 1 even though the seamen may be employed on a vessel chartered or made available to another department or agency of the United States for purposes of convenience in the war effort.

.        .        .        .        .

"With respect to seamen on foreign-flag vessels, the remedy provided by this legislation is, of course, in substitution for remedies that might exist under the laws of a country in which the vessel may be documented, and seamen proceeding under this section by such choice of remedies will have waived benefits under laws of any other country that might otherwise be available."

See also H. Report No. 107, *supra,* pp. 21 and 22.

the Suits in Admiralty Act. In the *Brady* case, under a petition of a visitor to the boat to recover against a similar agent, it was held a cause of action in tort at law would lie. The *Lustgarten* case was overruled. The only effect of the *Brady* decision was to hold that actions could be maintained against agents of the United States at common law for the agent's own torts. The case had nothing whatever to do with the right to recover against employers under the Jones Act. The opinion said, 317 U. S. at 577, "The sole question here is whether the Suits in Admiralty Act makes private operators such as respondent non-suable for their torts." "The liability of an agent for his own negligence has long been embedded in the law." *Id.*, at 580. "But it is a *non sequitur* to say that because the Act takes away the remedy of libel *in rem* in all cases involving government vessels and restricts the remedies against the United States and its wholly owned corporations, it must be presumed to have abolished all right to proceed against all other parties." *Id.*, at 582. "The question is not whether the Commission had authority to delegate to respondent responsibilities for managing and operating the vessel as its agent. It is whether respondent can escape liability for a negligent exercise of that delegated power if we assume that by contract it will be exonerated or indemnified for any damages it must pay." *Id.*, at 583–84. The case was then sent back to the Circuit Court of Appeals to determine whether a cause of action against the agent was established. All that was meant or said in *Brady* about *Lustgarten* was that the *Lustgarten* case was in error in saying that a seaman could not sue an agent for the agent's own tort. The *Brady* final statement on *Lustgarten* was, "Our conclusion, however, is that that position is untenable and that the *Lustgarten* case so far as it would prevent a private operator from being sued under the circumstances of this case

must be considered as no longer controlling." *Id.*, at 578. There is no reason here why the petitioner should not sue respondent for its alleged tort. What petitioner is attempting is to hold respondent liable as employer for negligence of petitioner's fellow servants, of petitioner's superiors or the Master under the Merchant Marine Act. This it cannot do under this record.[11]

It is suggested that the respondent may be in the position of an employer, as a charterer or owner *pro hac vice.* But a charterer or owner *pro hac vice,* who is also an employer, is one who takes over "the exclusive possession, command, and navigation of the vessel." *Reed* v. *United States,* 11 Wall. 591, 600. That is a bareboat charter. Under the contract in this case, the respondent had no

---

[11] 176 Ore. 662, 665, 668–669, 680, 695, 158 P. 2d 275, 276, 277–78, 282, 287–88:

> "On the trial the defendant moved for a directed verdict on the grounds that the evidence showed that the plaintiff was not employed by it and that his injury was not caused by its negligence. The court denied the motion, and in its charge left it to the jury to determine as a question of fact whether the relation of employer and employee existed between defendant and plaintiff."
>
> "There is no evidence that the defendant did anything in connection with the business of the vessel not contemplated by the terms of the service agreement, or that it exercised or attempted to exercise any control over the master or crew. Indeed, the uncontradicted evidence is that when it was the duty of the defendant to assist in the loading of the vessel it acted under the instructions of the master as to the time, place and method of loading."
>
> "As stated, the trial judge left to the jury the question of employer-employee relationship as one of fact. The propriety of that submission is not defended here, and it seems to be agreed by both parties that the question is one of law to be determined by the court. Of the correctness of this view we think there can be no doubt."
>
> "We find no such basis of liability in this case. The defendant was not responsible for a negligent order of the boatswain which sent the plaintiff into a place of danger. There is no evidence that the vessel was not properly equipped when it started on its voyage."

such authority.  As we have pointed out above, and as the contract shows, he acted for the United States under its command and then only in certain matters not connected with actual navigation.

The Court does not challenge the respondent's assertion that the Merchant Marine Act requires the employer-employee relationship.  It is said, "But it does not follow from the fact that Hust was technically the Government's employee that he lost all remedies against the operating 'agent' for such injuries as he incurred."  Certainly Hust did not lose his remedies against the agent for the agent's torts.  He still has those remedies but petitioner wishes to hold the agent as an employer.  There is here no "disruption" of the normal and past relationship between seaman and employer.  This Court errs, we think, in suggesting any seaman has been deprived of any right by the Clarification Act of 1943 under the construction of the Oregon Supreme Court.  No seaman ever had a right of recovery under the Merchant Marine Act except against his employer.  That the seaman still has.

What the Clarification Act does and what it obviously was intended to do, see notes 7 and 9, *supra,* was to continue the policy of requiring seamen who were employees of the United States to continue to vindicate those rights through the Suits in Admiralty Act.  Congress has been generous in permitting seamen to recover in court against the United States for torts.  It felt that the traditional proceeding in admiralty offered the best opportunity for justice to all such injured seamen when they were employees of the United States.[12]

A convenient summary of the attitude of the administrative agencies toward this problem is found in a letter of the War Shipping Administration to the National Labor

---

[12] See Remedies of Merchant Seamen Injured on Government Owned Vessels, 55 Yale Law Journal 584, 591.

Relations Board of October 20, 1942.[13]    Such administrative determination is entitled to weight.

We think that the judgment of the Oregon Supreme Court should be affirmed.

MR. JUSTICE FRANKFURTER and MR. JUSTICE BURTON join in this dissent.

---

[13] "The War Shipping Administrator has been advised that under the contractual arrangements mentioned above and for other reasons, the Master, officers and members of the crew of all vessels owned by or bareboat chartered to the War Shipping Administration are employees of the United States and particularly of the War Shipping Administration, and are so considered and treated at the present time by other governmental departments and agencies for the purposes of the Civil Service Retirement Act, the United States Employees' Compensation Act, the Federal Social Security Laws, and the Federal Employment Tax laws.   Furthermore, the wages of such personnel are exempt from attachment as government employees."