### PETERSON v. UNITED STATES.

### PETERSON v. LUCKENBACH S. S. CO., Inc.

Adm. 148–59.

Civ. 24–29.

United States District Court
S. D. New York.

Aug. 5, 1947.

The admiralty action (Adm. 148-59) was instituted under the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq., in the Eastern District against the respondent, United States of America, on February 10, 1944, and upon consent of the proctors it was transferred to the Admiralty Division of this Court by an order of Judge Kennedy dated February 14, 1947.

The civil action (Civ. 24-29) was commenced in this Court January 8, 1944, by the filing of a complaint which named only the Luckenbach Steamship Company, Inc. (a Delaware corporation) as a defendant. Jurisdiction was based upon diversity of citizenship. On January 7, 1946 an order was entered permitting the plaintiff to implead certain individuals constituting a partnership, known as McNulty Shipyards, Ltd., as party defendants. After the service of an amended complaint the additional defendants moved for judgment dismissing the complaint for lack of jurisdiction, because the said defendants, the McNultys, and the plaintiff are citizens of New York. The motion was granted on consent January 24, 1947. Then followed the order consolidating the admiralty action against United States of America and the civil action against Luckenbach Steamship Company, Inc. for trial. The trial came on before me on June 26th.

In both actions Alexander Peterson claims he was injured on February 12, 1943 while employed on board the S. S. Richard Gattling. In his action under the Suits in Admiralty Act he alleges that the respondent was the owner of the S. S. Richard J. Gattling, a merchant vessel, and operated and controlled it. In the civil action he alleges that the Luckenbach Steamship Company, Inc. was the owner or lessee of the vessel and as general agent operated and controlled it. In the admiralty suit he alleges that a certain chain, part of the vessel's equipment, broke while Peterson was aboard the vessel performing work for his employer (J. D. Banks & Co.), a third party, and that as a result of the breaking of the chain it struck him in the head and face, especially his left ear. It is alleged that the chain was unsafe and that respondent, United States of America, had knowl-

Louis Rothbard, of Brooklyn, N. Y. (Russell C. Gay, of New York City, of counsel), for libellant-plaintiff.

John F. X. McGohey, U. S. Atty., for the Southern District of New York, and Burlingham, Veeder, Clark & Hupper, all of New York City, for respondent, United States.

Burlingham, Veeder, Clark, & Hupper, of New York City, for defendant, Luckenbach S. S. Co.

LEIBELL, District Judge.

The above actions, one in admiralty and the other at law were tried together pursuant to an order of Judge Bright dated February 20, 1947, entered on consent of the parties and a waiver of trial by jury in the civil action.

edge thereof and failed to warn respondent of the dangers of the situation.

In the amended complaint in the civil action the accident is alleged to have occurred as a result of a defective winch, as well as chain, and the failure to have sufficient cables and clamps aboard to do the work in which plaintiff was engaged. The allegations of the libel were amended to conform to the complaint and the libellant asserted that the vessel was unseaworthy.

The facts developed at the trial may be summarized as follows:

The S. S. Richard Gattling was a liberty ship owned by the United States of America. The government, through the Administrator, War Shipping Administration, had entered into a service agreement with Luckenbach Steamship Company, Inc. to act as the General Agent for certain vessels (Ex. 3). The Gattling came under that agreement, which in its terms was similar to the "General Agent Service Agreement" discussed in Hust v. Moore-McCormack Lines, Inc., 328 U.S. 707, 66 S.Ct. 1218, 90 L.Ed. 1534. Under the terms of that agreement the United States of America agreed to provide insurance against all insurable risks and to indemnify the General Agent against all claims and demands asserted for injury to persons or property. [Art. 8; art. 16 (a)].

On April 1, 1941 the United States Maritime Commission entered into an agreement with McNulty Shipyards Ltd., of Brooklyn, for repairs or alteration of vessels for the Commission (Ex. E). The work was to be done at the shipyard of the contractor or in the vicinity thereof on a cost plus basis. The contract provided:

"Article VII. All Incidental Services and Facilities to be Provided. The Contractor will, at its own cost and expense, provide all materials, machinery, tools, appliances, heat, light, steam, water, electricity, labor, direction, supervision, and everything of any nature whatsoever which may be necessary for the proper execution and completion of the work according to the true intent and meaning of any specifications, plans or drawings referred to herein, whether expressly required by the terms thereof or reasonably to be inferred therefrom.

"The Contractor shall provide adequate and safe berthing facilities for the vessel while the work herein is being performed."

"Article X. Use of Equipment by Contractor. In the event that any of the vessel's machinery, equipment and fittings such as winches, pumps, rigging, pipe lines, etc., shall be used by the Contractor in the performance of work, the Contractor shall be responsible for any necessary reconditioning to make good any damage resulting from such use."

Schedule A, annexed to the contract, provided that the contractor would make "no charges for use of tools and/or equipment, except when necessary to hire same from outside sources. Hire of such to be charged at cost to contractor". As to the work of sub-contractors, that was to be charged "at cost."

On February 10, 1943 McNulty Shipyards Ltd. gave an order (Ex. F) to J. D. Banks to do "Rigging work as directed" in connection with the setting of certain pill boxes and guns in place aboard the S.S. Richard J. Gattling. The claimant, Alexander Peterson was an employee of J. D. Banks & Co. acting as a signal man for the winch operators. The vessel was at Pier 19, East River. Prior to his employment by Banks & Co., Peterson had been a structural iron worker and rigger for over thirty years. He was 60 years old at the time of the accident.

The vessel was a cargo carrier and was equipped with a number of winches. At some distance from the bow and forward of the mast there were two winches, the No. 2 starboard and the No. 2 port serving two hatches; aft of the mast and forward of the boat deck and bridge was another pair of winches, the No 3 starboard and the No. 3 port serving two hatches; aft of the boat deck and bridge was another pair of winches, a No. 4 starboard and No. 4 port, serving two hatches. On both sides of the bridge on the boat deck were two places fore and aft for gun emplacements (four places in all). The forward gun emplacement on the starboard side had already

been installed. The operation which resulted in the accident involved the setting of a pill box for the aft starboard gun emplacement. When the operation started on the afternoon of February 12, 1943 the pill box was on the main deck near the No. 4 starboard winch. That winch was used to lift the pill box which weighed 3 to 3½ tons. The fall from the No. 3 starboard winch was brought aft over the boat deck to the shackle of the No. 4 starboard fall but the operation could not be completed because the No. 3 starboard winch could not be operated in low gear, only in high gear, and in high gear it did not have sufficient power for the pull. The pill box was lowered again onto the main deck and at the request of Lundquist, the foreman in charge of the operation for Banks & Co., the ship's engineer tried to fix the gear of No. 3 starboard winch so that it would operate in low gear. After trying for ½ an hour he was unable to fix it and he so informed Lundquist.

The No. 3 port winch was in use by stevedores who were loading cargo into the hatch. The fall from the No. 2 starboard was not long enough to reach all the way back to the No. 4 fall. Lundquist conceived the idea of using the fall of the No. 3 starboard winch as an extension of the fall of the No. 2 starboard winch, and to tie or join the two in some way so that the No. 2 starboard winch, operating in second gear, could pull the pill box over to its place on the bridge, after it had been lifted to the proper height by the No. 4 starboard winch. To accomplish this Lundquist had to do two things; first find some means of attaching the No. 2 fall to the No. 3 fall, and then so synchronize the operation of the No. 2 and No. 3 winches that the No 3 winch would merely pick up the slack of its own fall between the point at which it was attached to the No. 2 fall and the No. 3 winch. Peterson and Lundquist tried to find some clamps to attach the No. 2 and No. 3 falls. None was in the deck house. Lundquist did find there a galvanized steel stopper chain consisting of links of ⅜ inch thickness; also some sisal rope. No one suggested to Lundquist that he use the chain. It was a means and method of his own selection.

The fall of the No. 3 starboard winch was attached to the shackle of the No. 4 starboard fall, which was used in lifting the pill box from the main deck to a height well above that of the gun emplacement. The fall of the No. 2 starboard winch (which was of the customary length) was stretched aft, over the bridge and boat deck, as far as it would go, and was attached to the fall of the No. 3 starboard winch at a point aft of where Peterson was standing. The chain was entwined around the No. 3 and No. 2 falls at their junction, and the ends of the chain were tied in with sisal. When the No. 4 fall lifted the pill box to the proper height, the No. 2 starboard winch operating in second gear began pulling the pill box forward towards the position at which it was to be put in place. The No. 3 starboard winch was operated in high gear for the purpose of taking up the slack of the No. 3 fall, which would develop as the pill box was being pulled forward by the No. 2 starboard winch. The fall of the No. 4 winch was gradually let out as the pill box was being pulled forward. Peterson was giving the signals to the No. 3 and No. 2 winchmen. He was aided by another signalman named Price, an employee of Banks & Co., who gave the signals to the No. 4 winchman to slacken. The three winchmen were employees of Banks & Co. The house at the base of the mast, located between the No. 2 and No. 3 winches, prevented the No. 3 and No. 2 winchmen from seeing each other. They could see their own falls and the signalman, Peterson. The boat deck and bridge prevented the No. 4 winchman from seeing the No. 3 and No. 2 winchmen.

In the actual operation, Doyle, the No. 3 winchman, at times would do more than pick up the slack of his fall and because his winch operated in high he would actually get the strain of the pull entirely on his fall and winch. This resulted in a release of the pull on the stopper chain and the No. 2 fall. When Doyle would stop his winch, so that the pull could be made through the No. 2 winch and fall, that would again put the strain on the stopper chain. This alternating of the pull through the No. 3 and No. 2 winches, resulted in a jerking or tugging on the chain,

each time the No. 2 winch took over the pulling. Finally a link of the chain broke when the pill box had been moved to within a few feet of its intended position, and the chain and the No. 2 fall came loose and struck Peterson on the left side of his face and head.

Libellant's attorney argues that the vessel was unseaworthy in that the No. 3 starboard winch was out of order, the stopper chain was "insufficient", and there were no clamps on board.

The No. 3 starboard winch operated properly when in high gear. For some reason, it could not be operated in its low gear. That would make the winch unseaworthy. But that condition was not a proximate cause of the accident, so that there would be no liability on the part of the respondent, United States of America, even if we were to assume that the duty the respondent owed to Peterson was the same as that owed to a member of the crew or to a stevedore loading cargo—a seaworthy ship.

■ Since libellant was not a member of the crew or a stevedore engaged in loading cargo, but an employee of a contract repairman, he was not entitled to a seaworthy ship on which to work. I believe that the applicable principle is set forth in a concurring opinion of Judge Learned Hand in Lynch v. United States of America et al., 2 Cir., 163 F.2d 97, 99, from which I quote the following: "The doctrine of Seas Shipping Co. v. Sieracki (328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099), covers stevedores, but the employees of a contractor still remain 'business guests,' as I understand it, and are not entitled to a seaworthy ship under the doctrine of the Osceola [189 U.S. 158]. The duty to them is therefore only to advise them of any known dangers, or any that would have been discovered by reasonable care. This duty is sometimes put as though it was the same as providing a safe place to work, but, strictly speaking, that is not true. The shipowner is not responsible for giving them a safe place to work; all he need do is to discover any dangers and tell them. Practically, there is probably not very much difference between the two duties.

In Hardie v. New York Harbor Dry Dock Corp. (2 Cir., 9 F.2d 545), we held that, if there was a safe way provided for an employee of a contractor, and he chose an unsafe way, the owner was absolved. That was right, as applied to the facts of that case, but I doubt that it would be safe to say that the mere existence of one safe way was always a complete exoneration. That depends, I think, upon the likelihood that the employees would not take the unsafe way; if there was a reasonable probability that they might do so, I think the shipowner's duty extends to reasonable care to see what dangers lurk in the other way, and to advise the employees of them. Our decision in Holm v. Cities Service Transp. Co. (2 Cir., 60 F.2d 721), is to explained in this way also, I should suppose."

It was the Banks Co. employees' faulty operation that finally snapped a link of the chain and caused the accident.

■ Lundquist, the Banks Co. foreman, should not have used the No. 3 starboard winch in the manner and for the purpose in which he employed it. He should have obtained a "pennant", i.e. an extra length of wire cable, to attach the No. 2 starboard fall and thus reach the shackle of the No. 4 fall. An expert called by respondent so testified and his testimony was very convincing. Lundquist was then recalled as a witness and testified that he did not find any wire pennant aboard the vessel and that the Banks Co. employees did not have any such equipment with them on the job. If the vessel did not have aboard an extra length of cable, Lundquist should have obtained one elsewhere. McNulty's contract required the contractor to supply his own necessary equipment. Banks Co. was McNulty's subcontractor. If the equipment aboard ship was insufficient Lundquist should have notified the Banks Co. It should not have been too difficult to get an extra length of cable.

Another solution would have been an arrangement by which Lundquist would have used the No. 3 port winch, which at the time was in use by stevedores loading cargo. After the accident the pill

box was lowered to the main deck by the No. 4 winch and later the No. 3 port winch was used together with the No. 4 winch to perform the operation. It was unnecessary to use either the No. 3 starboard winch or the No. 2 starboard winch.

The condition of the No. 3 starboard winch was not a proximate cause of Peterson's accident. The condition of the winch was known to Lundquist, the foreman of the Banks Co. employees. The proximate cause of the accident was the manner in which the Banks Co. used the ship's gear and equipment. It was a most unusual use, one not reasonably to be anticipated, and a use for which the equipment was never intended. There was no negligence or breach of any duty towards the claimant Peterson on the part of either the United States of America, the owner of the vessel, or the Luckenbach Steamship Company, Inc., the corporation which had the operation and control of the vessel at the time of the accident.

Although the above discussion of the question of liability disposes of the case, it may be proper to add something about the claimant's injuries and damages, in the event that an appellate court might hold that there is liability on the part of either the respondent or the defendant.

The claimant was injured by the stopper chain and the No. 2 starboard fall striking him about the head and face. His face was cut and bruised and the hearing of his left ear has been permanently impaired as a direct result of the accident. After he was struck he received first aid at an office on the pier and was told to see his family doctor. The doctor was away on war service. Peterson returned to his job the next day and asked where he should go. He went to a Dr. Cooley whom he knew, and was examined. The job foreman told him to come back and do some easy work. In April he collapsed and went to the eye and ear hospital on April 13th where he remained 7 or 8 days. He had been feeling bad and was getting worse. His left ear was running and he had pains in his head with some dizziness at times. In June or July of 1943 he was fired for drunkenness, which he denies.

From the last of April 1943 to the end of 1943 he worked only 25 weeks; and about another 25 weeks in 1944. In 1945 he worked 10 or 15 weeks. His last job was in August 1946.

Peterson had had ear trouble before the accident; his right ear had become impaired from a catarrhal condition. In the right ear he has a loss of 50% to 55% in low register and 70% in high register. In the left ear the loss is 40% to 45% in the low register, and about 70% in the high.

The claimant was earning about $85 a week at the time of the accident in February 1943. He was then 60 years old. Although his life expectancy was 11 years, his work expectancy at the type of work he was doing was probably about 5 years. After that he could do the work of a watchman, in which his impaired hearing would not be too great a handicap. In fact he was fit to do that type of work soon after the accident. A watchman would earn considerably less, about $35 a week.

For the loss of earning power in the 5 year period after the accident (for part of that time he worked at his old regular pay) his damages would be $7,500, calculated at $50 a week for 150 weeks. For his pain and suffering an allowance of $1,000 would be proper. For medical expenses $50—Total $8,550. In my opinion that is the damage he suffered as a result of the accident. But he has no claim against the respondent (United States of America) in the admiralty action, or against the Luckenbach Steamship Company, Inc., the defendant in the civil action.

The libel and the complaint are dismissed on the merits.

I am filing one set of findings of fact for both actions and separate conclusions of law for each action.