## PUBLICKER COMMERCIAL ALCOHOL CO. v. INDEPENDENT TOWING CO. , et al.

## SAME v. AMERICAN–HAWAIIAN S. S. CO.

### Nos. 9348, 9351.

Circuit Court of Appeals, Third Circuit.
Argued Oct. 20, 1947.
Decided Jan. 28, 1948.

S. B. Fortenbaugh, Jr. of Philadelphia, Pa. (Benjamin F. Stahl, Jr., and Clark, Brown, McCown, Fortenbaugh & Young, all of Philadelphia, Pa., on the brief), for Publicker.

Thomas E. Byrne, of Philadelphia, Pa., (Krusen, Evans & Shaw, of Philadelphia, Pa., on the brief), for American-Hawaiian S.S. Co.

Robert G. Kelly, of Philadelphia, Pa., for Independent Towing Co.

Howard M. Long, of Philadelphia, Pa. (Howard T. Long, of Philadelphia, Pa., on the brief), for Tugboat Neptune Co. and Tugboat Triton Co.

Before BIGGS, GOODRICH, and McLAUGHLIN, Circuit Judges.

BIGGS, Circuit Judge.

The "William J. Worth," a vessel owned by the United States through the War Shipping Administration and operated by American Hawaiian Steamship Company under the usual General Agent Service Agreement,[1] collided on September 30, 1944 with the end of Pier 103 in the Delaware River at Philadelphia. The pier was owned by Publicker Industries, Inc. Orders issued from army and navy authorities on September 29 scheduling the Worth to sail at 6:00 P. M. on the next day. Her cargo had been loaded under the direction of a lieutenant of the United States Army who had overruled the suggestion of her captain that certain deck cargo placed on board just prior to sailing be loaded on the forward deck rather than near the stern. When the Worth sailed her stern draft was approximately 31½ feet and at the time of sailing the ship actually was resting on the mud at the bottom of the river. Low tide was at 6:42 P. M.

On September 29 Hawaiian had notified Curtis Bay Towing Company of the intended sailing of the Worth. Curtis operated a number of tugs. At 3:00 P. M. on September 30, the day of the collision, Curtis, finding that it did not have towboats available, communicated with Independent Towing Company, as it had the right to do under its contract, and requested Independent to undertake the undocking operation. Independent acted as agent for two tugs, the "Neptune" and "Triton," owned respectively by two separate corporations, Tugboat Neptune Company and Tugboat Triton Company.

The Neptune and the Triton appeared alongside the Worth at Pier 98 at about 6:00 P. M. Captain Marvel of the Neptune went on board the Worth to act as the undocking pilot. The tide was still running out and was near to full ebb. An easterly wind was blowing at about thirteen miles an hour. The Worth was bow-in toward the land. Astern of her and moored to the same side of the same dock was another vessel about as large and as long as the Worth. By reason of this fact, to undock the Worth it was necessary to bring her out to the center of the slip between Pier 98 and the next to the south, Pier 100, and then move her down the river. The Worth was first maneuvered broadside toward the center of the slip. The two tugs then eased her aft. At this point the Worth struck a bar or hump at the bottom of the slip and began to veer

---

[1] The General Agency Agreement provided in pertinent part:

"Article 1. The United States appoints the General Agent as its agent and not as an independent contractor, to manage and conduct the business of vessels assigned to it by the United States from time to time.

\* \* \* \* \* \* \*

"Article 2A. \* \* \*

"(d) The General Agent shall procure the Master of the vessels operated hereunder, subject to the approval of the United States. The Master shall be an agent and employee of the United States. \* \* \* The General Agent shall procure and make available to the Master for engagement by him the officers and men required by him to fill the complement of the vessel. Such officers and men shall be procured by the General Agent through the usual channels and in accordance with the customary practices of commercial operators. \* \* \* The officers and members of the crew shall be subject only to the orders of the Master."

In Hust v. Moore-McCormack Lines, 328 U.S. 707, 724, note 30, 66 S.Ct. 1218, 1226, 90 L.Ed. 1534, the Supreme Court stated in respect to a General Agency Agreement:

"Under the General Agent Service Agreement the shipping company does not agree to man the vessel. It agrees to procure the master, subject to the approval of the United States. The master is an agent and employee of the United States and has complete responsibility and authority with respect to the navigation and management of the vessel. The general agent agrees to procure officers and men through the usual channels, and in accordance with the customary practices of commercial operators and to make them available to the master. It is provided that officers and members of the crew 'shall be subject only to the orders of the Master.'"

to starboard toward the port side of the ship moored astern of her. To counteract this movement both the Triton and the Neptune went astern and the Worth's engines were put ahead with her rudder hard right. This broke the sheer. Another attempt was then made to ease the Worth out toward the breast of the river. This time, however, she began to sheer to port and toward Pier 103 which extended into the river beyond and further out than Pier 98 or Pier 100. The Worth was still aground at the bow.[2] The Triton could not hold her off against the ebbing tide and Captain Cooper of the Triton, believing that his tug would be caught between the ship and Pier 103, cast off lines and the Triton escaped into the open river between Pier 103 and the Worth's stern. The port side of the Worth struck a corner of Pier 103, 130. to 150 feet forward of her stern, and scraped along the pier damaging it. The Triton joined the Neptune on the port side of the Worth and, acting together and using the end of the pier as a pivot upon which to turn the Worth, they pushed her out into the stream. The damage to the pier was substantial.

As indicated Captain Marvel of the Neptune was on the bridge of the Worth with her master, Captain Ryder, throughout the whole undocking operation. At the beginning of the operation Captain Marvel discussed with Captain Ryder what both believed to be a fact that the Worth lay close to the bottom of the slip. Captain Ryder made it plain that despite what each thought to be the Worth's unfavorable position in relation to the slip the vessel should be undocked in accordance with the directions of the army and naval authorities. Actually, as we have stated, the Worth lay in the mud at the bottom of the slip. Save for the original casting-off Captain Marvel gave all orders during the undocking operation.

■ The suit at bar is at common law[3]; not in admiralty. It is based on diversity and jurisdictional amount.[4] It is not for a maritime tort. The law of Pennsylvania is of course applicable. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487. Suit was commenced by a complaint filed by Publicker against Hawaiian, Independent, Tugboat Neptune Company and Tugboat Triton Company. Curtis was impleaded subsequently by a third party complaint. The court below dis-

---

[2] See Captain Marvel's testimony. Some of the testimony might lead to the conclusion that the Worth went aground a second time during the undocking maneuver.

[3] That the suit is one at law is demonstrated by the pleadings. See also The Plymouth, 3 Wall. 20, 18 L.Ed. 125; Johnson v. Chicago, etc., Elevator Co., 119 U.S. 388, 397, 7 S.Ct. 254, 30 L.Ed. 447; Homer Ramsdell Co. v. Compagnie Generale Trans-atlantique, 182 U.S. 406, 411, 21 S.Ct. 831, 45 L.Ed. 1155; Cleveland Terminal & V. R. Co. v. Steamship Co., 208 U.S. 316, 319, 320, 28 S.Ct. 414, 52 L.Ed. 508, 13 Ann. Cas. 1215; The Troy, 208 U.S. 321, 323, 28 S.Ct. 416, 52 L.Ed. 512; Martin v. West, 222 U.S. 191, 197, 32 S.Ct. 42, 56 L.Ed. 159, 36 L.R.A.,N.S., 592 and The Kearney, 3 Cir., 14 F.2d 949.

We make this comment because the parties have treated the accident as one of maritime tort and have cited admiralty cases only and have made no reference to the law of Pennsylvania.

[4] Publicker is a Pennsylvania corporation; Hawaiian, a Connecticut corporation; Independent, Tug Boat Triton Company and Tug Boat Neptune Company are Delaware corporations. Curtis Bay, the third-party defendant, is a Pennsylvania corporation. Publicker did not amend its complaint to state any cause of action against the third-party defendant.

Under the circumstances of the instant case, the court below was not ousted of jurisdiction by the summoning of the third-party defendant, Curtis Bay, a Pennsylvania corporation. Cf. McDonald v. Dykes, D.C.E.D.Pa., 6 F.R.D. 569, affirmed per curiam by this court in 163 F.2d 828. In the cited case McDonald amended her complaint to state a cause of action against the third-party defendant after the latter had been made a party to the suit by the original defendants.

Since there was no appeal from the order of the court below dismissing the suit as to Curtis Bay it is not necessary for us to express our opinion as to jurisdictional questions, if any, which might have been involved as between Curtis Bay and the original defendants. See Moore's Federal Practice, Vol. 1, p. 779 et seq. Compare State of Maryland to Use and Benefit of Wood v. Robinson, D.C., 74 F.Supp. 279, See also Morris, Wheeler & Co. v. Rust Engineering Co., D.C. Del., 4 F.R.D. 307.

missed the complaint as to all defendants save Hawaiian. Two appeals followed. One, at No. 9351, is by Hawaiian, assigning its liability as error; the other is by Publicker assigning as error the dismissal as to the other original defendants. The suit was dismissed as to the third party defendant, Curtis, and no appeal was taken by any party from this dismissal.

The court below in its opinion stated that "The acts performed and conditions created at the instance of agencies of the United States, under the exigencies of war rendered the operation of the Worth by * * * Hawaiian * * * difficult and hazardous. The operation of the ship in such manner as to damage the plaintiff's pier was attributable to errors of judgment, failures to take precautions and the imputed negligence of the servants and agencies of the United States, which controlled or directed the loading and the movements of the ship."

■ The primary error of the trial court seems to lie in its assumption that because the naval authorities of the United States had directed that the Worth be undocked at 6 P. M. on September 30, the ship had to be undocked at the stated time; that every injurious consequence flowed inevitably therefrom almost as if without the interposition of any human agency. It would be inequitable therefore, reasoned the court below, to fix liability on any corporation or individual other than Hawaiian which was acting as the agent for the United States which in effect issued the undocking order. But this theory or doctrine of the District Court was erroneous. We do not doubt that Captains Ryder, Marvel and Cooper acted from patriotic motives in moving the dangerously loaded Worth out into a shallow river at low tide in order to meet a convoy-sailing time but the quality of the motives which induced the undocking operation will not excuse negligent action causing damage unless it be shown that the persons named were under some legal compulsion to act as they did. There is no showing of legal compulsion in the record and we doubt if such can be proved.

The court below made a specific finding of fact that Captain Marvel of the Neptune "went aboard the bridge of the Worth and took command of all operations". It found also that the Worth was "under the general command" of Captain Ryder at all times and that the ship's engines were employed in the undocking movement. The trial court determined as well that Captain Marvel of the Neptune and Captain Cooper of the Triton were aware of the "excessive draft" of the Worth, the depth of the water in the slip and that there was "a hump or lump" running across the outer end of the slip and the state of the tide at the time of the undocking operation. The court found also that both tugs had facilities to request the assistance of an additional tug or tugs expeditiously, and that "No attempt was made by use of these or other communication facilities to secure additional towing services." The court below then proceeded to absolve the two tugboat companies and the respective masters of the tugs from any negligence. The court refused to find "That * * * Independent * * * having been requested by Curtis * * * to furnish two tugs performed its legal duty in sending the 'Neptune' and the 'Triton' to do the job * * *," but nonetheless found Independent not to be guilty of any negligence.

There are of course many other findings of fact but these need not be detailed in this opinion. Some of the findings of fact quoted above are inconsistent with each other or are without substantial basis in or are contrary to the evidence. Some of the conclusions of law are inconsistent with the findings of fact. Such a conclusion is the one respecting Captain Marvel's lack of negligence since the court found him to be in charge of the undocking operation and found also that he was aware of the condition of the ship and the river. The court below merely took the requests for findings of fact and conclusions of law submitted by the parties and adopted an undesirable "shorthand" method of rejecting certain requests by number and affirming all others. The course thus pursued and the court's theory that the army and naval authorities alone were responsible for the collision go far to explain the disparity between findings as well as the dissonance of findings and conclusions.

■ The judgment against Hawaiian must be reversed. The decision of the Supreme Court in Caldarola v. Eckert, 332 U.S. 155, 67 S.Ct. 1569, 1570, seems to relieve Hawaiian of any liability for damages to Publicker in the suit at bar. The analogy presented by the Caldarola decision is persuasive. In that case the Supreme Court, stating that "to the extent that the determination of tort liability in New York [Pennsylvania] is entangled with the construction of the contract between the Agents [Hawaiian] and the United States, the interpretation of that contract is a matter of federal concern and is not concluded by the meaning which the State court may find in it," held that under the federal law the agents were not in possession and control of the vessel and were not "to be deemed, as a matter of federal law, owners of the vessel pro hac vice * * *." The substance of the Caldarola decision is that all persons, other than seamen, negligently injured through the operation of a ship operated under a general agency agreement must look to the United States for recovery of damages. We are of the opinion that a tort giving rise to damage to property would fall into the same category as one causing injury to the person. Cf. Hust v. Moore-McCormack Lines, 328 U.S. 707, 66 S.Ct. 1218, 90 L.Ed. 1534 and Brady v. Roosevelt Steamship Co., 317 U.S.575, 63 S.Ct. 425, 87 L.Ed. 471. See also Virginia Law Review, Vol. 33, No. 6, at pp. 763-764.

■ The liability of the other original defendants save Independent to Publicker must be redetermined by the court below in accordance with the law of Pennsylvania where the tort occurred. In ascertaining that law the court is of course entitled to make use not only of pertinent decisions of the State courts of Pennsylvania, if there be any,[5] but also to employ rulings of the maritime law, including those of the District Courts of the United States for the Districts of Pennsylvania,[6] or any other maritime decisions which may seem to reflect the law of Pennsylvania.[7] The trial court must make findings of fact based on the evidence and file conclusions of law in accordance therewith.[8]

■■ We shall not, however, set aside the judgment in Independent's favor. The findings of fact made by the trial court in respect to it find support in the evidence and we cannot say that they are clearly erroneous. Nor can we conclude that the court below erred as a matter of law in failing to pierce the corporate veils of Triton Company and Neptune Company to hold Independent liable. No sufficient basis to effect this result was established.

The judgment against Hawaiian will be reversed. The order of the court below dismissing the case as to Tugboat Neptune Company and Tugboat Triton Company will be vacated. That portion of the order dismissing the cause as to Independent will be affirmed.

---

[5] No pertinent Pennsylvania decisions are cited in the briefs of the parties and we have found none.

[6] See for example, American South African Luine, Inc., v. Sheridan & Co., D.C.E.D. Pa., 1936, 1936 A.M.C. 287.

[7] For example, the decision of the Circuit Court of Appeals for the Second Circuit in Robins Dry Dock & Repair Co. v. Navigazione Libera Triestina, 32 F.2d 209, 1929 A.M.C. 897, certiorari denied 280 U.S. 574, 50 S.Ct. 30, 74 L.Ed. 626, a case in which the circumstances are quite similar to those at bar, may prove pertinent as a decision which would be followed by the courts of Pennsylvania.

[8] We shall not analyze the findings of fact and conclusions of law filed by the court below; to do so would extend this opinion to too great a length.