PUBLICKER INDUSTRIES, Inc., v. AMER-ICAN–HAWAIIAN S. S. CO. et al. (Curtis Bay Towing Co. of Pennsylvania, Third-Party Defendant).

Civil Action No. 4325.

District Court, E. D. Pennsylvania.

March 18, 1948.

As Amended March 19, 1948.

Samuel B. Fortenbaugh, Jr., of Clark, Brown, McCown, Fortenbaugh & Young, all of Philadelphia, Pa., for plaintiff.

Thomas E. Byrne, Jr., of Krusen, Evans & Shaw, all of Philadelphia, Pa., for American-Hawaiian S.S. Co.

Robert G. Kelly, of Philadelphia, Pa., for Independent Towing Co.

Howard M. Long, of Philadelphia, Pa., for Tugboat Neptune Co. and Tugboat Triton Co.

Rawle & Henderson, of Philadelphia, Pa., for Curtis Bay Towing Co.

**224**

WELSH, District Judge.

Appeals were taken from the judgment entered herein against the American-Hawaiian Steamship Company and from the dismissal of the cause as to the other original defendants. The Circuit Court in its opinion, Publicker Commercial Alcohol Co. v. Independent Towing Co., 3 Cir., 165 F.2d 1002, has determined that the judgment against Hawaiian must be reversed, and that the order dismissing the cause as to the Independent Towing Company be affirmed. The Circuit Court directed that the order of dismissal be vacated as to the Tugboat Neptune Company and Tugboat Triton Company, and that the liability of the original defendants, other than Independent, be redetermined in accordance with the law of Pennsylvania.

In pursuance of the mandate of the Court, we have reviewed the record and the law in the light of the Court's comments and make the following amended

### Findings of Fact

1. The plaintiff Publicker Industries, Inc., is a Pennsylvania corporation having its principal office in Philadelphia, and was at all times material to this case the owner of Pier 103 South Wharves, Philadelphia, Pa.

2. The defendant American-Hawaiian Steamship Company is a Connecticut corporation having a place of business in Philadelphia and was at all times material to this case the agent of the United States acting through the War Shipping Administration, which administration was the owner of the S.S. William J. Worth.

3. The Independent Towing Company is a Delaware corporation having its place of business in Philadelphia, and is engaged in the maritime towing business.

4. The Tugboat Neptune Company is a Delaware corporation having its place of business in Philadelphia, and was at the times herein referred to the owner and operator of the Tugboat Neptune.

5. The Tugboat Triton Company is a Delaware corporation having its place of business in Philadelphia and was at the times herein mentioned the owner and operator of the Tugboat Triton.

6. On September 29, 1944, the American-Hawaiian Steamship Company ordered the Curtis Bay Towing Company, which company was engaged in maritime towing, to undock the William J. Worth, which was moored bow-in along the south side of Pier 98 South, Philadelphia.

7. The Curtis Bay Towing Company, not having tugboats available, requested the Independent Towing Company to undertake the undocking operation as it had a right to do under its contract.

8. The Independent Towing Company acted as agent for the two tugs Neptune and Triton. The Independent Towing Company was not advised and did not request information concerning the draft of the William J. Worth, and no information was given by the agent of the American-Hawaiian Steamship Company concerning the draft of the Worth.

9. The undocking of the William J. Worth commenced at about 6:00 p. m. on September 30, 1944. Her draft was approximately 31 feet 6 inches at the stern, and 25 feet 6 inches at the bow, with the bottom resting on the mud. Low tide was at 6:42 p. m.

10. The cargo of the Worth had been loaded under the direction of a United States Army Lieutenant who had overruled the suggestion of her captain that certain deck cargo be loaded on the forward deck rather than near the stern.

11. The tugboats Neptune and Triton were dispatched by the Independent Towing Company to assist in the undocking of the William J. Worth. Captain Marvel of the Neptune and Captain Cooper of the Triton were masters of the respective tugs, and the undocking operation was under the general charge of Captain Marvel. The William J. Worth was under the general command of Captain Ryder, and in the undocking operation the ship's engines were employed in furnishing power.

12. Captain Marvel of the Neptune went on board the Worth to act as the undocking pilot. Except for the original casting off, Captain Marvel gave all orders during the undocking operation.

13. The tide was running out and was nearly at full ebb. An easterly wind was

blowing at about 13 miles an hour. The Worth was bow-in toward land. Astern of her and moored to the same side of the dock was another vessel about the same size. This made it necessary to move the Worth broadside into the slip between Pier 98 and the next pier to the south, and then move her astern into the river. The beam of the Worth is approximately 57 feet.

14. The Neptune was made fast to the Worth on her port bow headed toward the river and the Triton on the port quarter, also headed toward the river; the Worth was maneuvered broadside into the slip and the two tugs began to ease her aft. The vessel struck a bar or hump at the bottom of the slip and began to shear to starboard toward the port side of the ship moored astern of her. To counteract this movement the tugs went astern and the Worth's engines were put ahead with the rudder hard right, which broke the shear toward starboard. Both the tugs were being used to ease the Worth out toward the breast of the river, but she began to shear to port and toward Pier 103, which extended into the river farther than Pier 98 or Pier 100. The tugs were unable to control the movement, and Cooper, Captain of the Triton, fearing that his tug would be crushed, cast off from the Worth and went around her stern, joining with the Neptune at her port bow in an effort to control the vessel. The port side of the Worth struck a corner of Pier 103 about 130 feet forward of her stern and caused damage to the pier, which was then used as a pivot to turn the ship and move her into the stream.

15. At the beginning of the operation Captain Marvel discussed with Captain Ryder what both believed to be a fact, that the vessel was drawing too much water to start out on the ebb tide. Captain Marvel was advised, however, that the vessel must be moved in accordance with the directions of the Army and Navy in order to join a convoy bound for Europe.

16. The captains of the tugs Neptune and Triton were aware of the excessive draft of the Worth, the depth of the water in the slip adjacent to Pier 98, the fact that there was a bar or hump in the center thereof, and the condition of the tide and the wind. They realized the prospective difficulty in the moving of the vessel in the face of such conditions, but they undertook to accomplish the operation in spite of the known risk.

17. The tugs Triton and Neptune both had radio communication facilities which could have been used to request the assistance of additional tugs, but the tug captains failed to make use of these or other communication facilities to secure additional towing services.

18. The cost of repairs to the pier was $10,107.47.

The judgment entered in favor of the Independent Towing Company was affirmed, the findings of fact being supported by the evidence and there being no legal error in our failure to pierce the corporate veils of the Triton and Neptune Companies in order to impose liability on Independent. No appeal was taken from the dismissal of the cause against Curtis Bay Towing Company, the added defendant, and presumably such dismissal did not constitute an error in the opinion of the parties or of the Appellate Court.

The Circuit Court has declared, however, that [165 F.2d 1006] "the judgment against Hawaiian must be reversed" on the authority of Caldarola v. Eckert (332 U.S. 155, 67 S.Ct. 1569, 91 L.Ed. 1968, decided June 23, 1947, after the original opinion filed herein). The court however directed that the liability of the other original defendants—i. e., Tugboat Triton Company and Tugboat Neptune Company—be redetermined in accordance with the common law of Pennsylvania if any pertinent state decisions be found, or in accordance with the rules of maritime law which seem to reflect the law of Pennsylvania.

The Circuit Court declared that the Caldarola case released Hawaiian from any liability to the plaintiff because of the persuasive analogy of its decision, and that "the substance of that decision is that all persons, other than seamen, negligently injured through the operation of a ship operated under a general agency agreement must look to the United States for recovery of damages. We are of the opin-

ion that a tort giving rise to damages to property would fall into the same category as one causing the injury to the person." We take that expression to mean that in cases where the United States or its agents are in possession of and responsible for the operation of a ship operated under a general agency agreement, a tort giving the right to damages for property injury must be redressed by an authorized action against the United States. Such rule, however, would not be applicable where the operation of the vessel is under the control of an independent contractor who, through negligence and failure in the common law duty to use that which he controls so as not to injure others, has caused property damage.

There appears to be authority for holding that where a tug captain in charge of the docking or undocking of a vessel is negligent in the performance of that duty and causes injury to persons or property by reason of such negligence, he is liable in damages, notwithstanding the use of the vessel's power in such movement, or the existence of contracts or other elements affecting the relationship or liability of the owners and operators and their agents, as between themselves.

■ No pertinent Pennsylvania authorities have been found, nor are those relied upon by the respondents concerning the "loaning" of employees and equipment, deemed controlling. Several maritime cases however seem to impose liability on the tug owners under the above stated principle. In American South African Line v. Sheridan & Co., 1936 A.M.C. 287, damages were claimed to a vessel being moved from a pier. The vessel was being taken out of the dock into the main channel by the respondent, which had furnished two tugs for such purpose. It was held that the tug owner is responsible for the negligence of the tug master on the bridge of the ship, when the tug master goes upon the bridge knowing the lack of power of the tugs, and notwithstanding the fact that the ship was proceeding under its own helm and power with the assistance of the tugs. The court said that where tugs are supplied with insufficient power to handle the ship, the tug master directing opera-

tions from the bridge was at fault for attempting to do what he knew could not be done in safety. The cause of the damage was said to be in the insufficiency of the power of the tugs to hold the ship against the wind and the tide, and the negligence consisted of not having provided a sufficient number of tugs with adequate power. Attempting to do what he knew could not be done in safety would put the tug master in fault. The court also declared that the pilotage clause meant that the tug master was to be judged, in what he did, as the master of the ship would be judged were he directing the maneuver.

■ Robins Drydock & Repair Company v. Navigazione Libera Triestina, 2 Cir., 1929, 32 F.2d 209, is analogous in many of its facts. The Circuit Court there held that the plaintiff had the burden of proving negligence and was not entitled to a verdict simply by showing that the ship moved ahead contrary to the tug captain's orders. The tug captain's orders and the subsequent movement of the vessel were important, but they did not solely determine the liability; other elements including the conduct of the ship's captain, the cause of the forward movement, and the failure to stop were also to be regarded. The judgment for the defendant ship owner was reversed by reason of facts indicating that the master of the vessel may have been negligent under the circumstances. The case of The Niels R. Finsen, D.C., 52 F.2d 795, involved a collision with a moored barge attributable solely to the careless navigation of the steamship. The towing company as an independent contractor had undertaken through its employees to undock the steamship, and by reason of their negligence was held liable for damages. American Diamond Lines v. McAllister Towing and Transportation Company, 2 Cir., 104 F.2d 670, also holds that one who is under contract to dock or undock a vessel is responsible as principal for the negligence of the agent whom the contractor places on the ship in charge of operations. Such negligence is that of an independent contractor who has taken over the navigation of the ship.

Such authorities are believed to be pertinent as decisions which would be followed by the courts of Pennsylvania and we adopt them in determining the liability of the defendants in this case. In view thereof we find justification in the conclusion that the captains of the tugs Triton and Neptune and each of them realized the difficulties of the joint task of moving the Worth from the slip under the circumstances of this case, and the hazards involved. Although Captain Marvel was nominally in charge of the operation in that he directed the movement from the bridge of the Worth, he was dependent upon the joint aid of Captain Cooper and the vessel under his command in undertaking the task. We believe that Captain Cooper was also responsible with Captain Marvel in testing the known danger and in failing to secure additional tug power when they both knew of the difficulties which they faced. By reason of the responsibility of the respective captains in command of the two towing units and their joint contributions to the negligence which resulted in the damage, we are of the opinion that the owners of the tugs became responsible for the negligence of their respective servants. We therefore reach the following amended

### Conclusions of Law

1. This Court has jurisdiction of the subject matter and of the parties in this case.

2. The plaintiff's damage to Pier 103 as claimed was caused by the fault and negligence of the defendant Tugboat Neptune Company and the defendant Tugboat Triton Company, and their employees or agents, in that such agents did not secure additional towing services required to move the Worth safely from its dock. Said servants attempted to undock the Worth with inadequate towing facilities under circumstances which led them to believe that such undocking would be difficult and hazardous.

3. The damage to Pier 103 was not caused or contributed to by the plaintiff, its servants, agents, or employees, and the terms of the general agency contract do not affect the liability of the Independent Towing contractors to the plaintiff.

4. A decree may be entered in favor of the plaintiff and against the defendants Tugboat Neptune Company and Tugboat Triton Company for $10,107.47, with interest from January 17, 1945, and costs, and the cause dismissed as to the defendant American-Hawaiian Steamship Company.