### AMERICAN DREDGING CO. v. UNITED STATES et al.

### THE L. Y. SCHERMERHORN.
#### No. 9719.

United States Court of Appeals
Third Circuit.

Argued March 24, 1949.

Decided April 13, 1949.

Motion for Clarification Argued
April 22, 1949.

Denied May 6, 1949.

ney, Philadelphia, Pa., J. Frank Staley, Washington, D. C., on the brief), for the Government.

Before GOODRICH, McLAUGHLIN and O'CONNELL, Circuit Judges.

GOODRICH, Circuit Judge.

This is a libel in personam brought by the American Dredging Company, owner of the Steam Tug L. Y. Schermerhorn, against the United States, Parry Navigation Company, Inc. and Union Stevedoring Corporation. The action was brought for injuries suffered by the tug Schermerhorn in an accident which took place at the Greenwich Coal Pier, Delaware River, Philadelphia, about 7:30 P. M. on the evening of January 22, 1946. The libel was dismissed on the merits and the libellant appeals.

Differing from many accident cases this one presents comparatively little conflict in the testimony. The point in controversy between the parties is the correctness of the conclusion reached by the Trial Judge upon the facts, not the question of what facts occurred. Our questions are: (1) upon the facts shown was the libellant negligent in the operation of the tug; (2) was there negligence on the part of the Stevedoring Company or those in charge of the liberty ship, Royal S. Copeland?

McLAUGHLIN, Circuit Judge, dissenting.

———◆———

The fact situation can be briefly described. The liberty ship, Royal S. Copeland, was, on the 22d of January, 1946, at the Greenwich Pier loading coal. She was moored starboard bow to the south side of the pier, with her hull projecting from the pier at an acute angle. The night was clear. The tide had been running ebb for something more than two hours and was three feet above low water. There was a light wind downstream. About 150' south of the pier there was a mud flat. A dredge belonging to the libellant was working in the area between the pier and the mud flat digging out silt. The Schermerhorn was coming in with an empty scow 144' x 40' which was to be delivered to the dredge and the filled scow removed. The Copeland, The Schermerhorn, the dredge, the empty scow and the loaded

Samuel B. Fortenbaugh, Jr., Philadelphia, Pa. (Benjamin F. Stahl, Jr., Clark, Brown, McCown, Fortenbaugh & Young, Philadelphia, Pa., on the brief), for appellant.

Horace T. Atkins, New York City (Atkins & Weymar, New York City, Rawle & Henderson, Philadelphia, Pa., on the brief), for Union Stevedoring Corp.

John T. Casey, Washington, D. C. (Gerald A. Gleeson, United States Attor-

824

scow were the sole occupants of the area between the pier and mud flat at the time in question.

The Schermerhorn came toward shore in a course parallel with the pier. She was towing the empty scow which was fastened to her port side. When she drew close to the ship she made a sharp left turn to clear the stern, followed soon by a right turn which brought her along the port side of The Copeland, the object being to approach the dredge by proceeding closely along the pier. The climax to this mildly exciting story of the perils of the sea may be related in the words of finding of fact 14 made by the District Judge: "14. When the 'Schermerhorn' reached a position approximately abreast the number four hold of the 'Copeland,' the 'Schermerhorn's' stack became fouled with a guy which extended from the end of the port after boom of the 'Copeland' to the vessel's rail. The 'Schermerhorn's' stack was raked aft, and she received certain other damage. There was no apparent damage to the 'Copeland.'"

Who must pay the costs of repairs to The Schermerhorn? There was a considerable amount of testimony and an even larger amount of argument concerning the position of the boom on the deck of The Copeland. This was a 54' boom supported by the after-mast. While the coal was being loaded this boom was left at an angle of about 45° and it projected some 14' or 15' beyond the side of the vessel. The argument for the libellant was that this was a dangerous situation in which to leave a boom. It was answered by saying that this position of a boom is the customary one while a ship is being loaded and that topping a boom would be a time consuming and, therefore, an expensive process.

This is all very interesting and sometime we may have to decide whether the leaving of a boom in this way is either negligence per se or sufficient grounds on which the trier of the fact can find negligence. But we do not have to do it in this case. The Schermerhorn's stack did not hit the boom, but instead was fouled by the wire cable which hung from it. That is what the Trial Judge found was the cause of the accident and a reading of the testimony leaves no doubt in our minds that this was correct. This wire cable which caught the stack ex-tended from the end of the boom to the rail or deck of the ship. It must have been loose, we think, or it could not have caught the stack the way it did. It is one thing to insist that a boom extending overside during loading is a convenience which meets the test of reasonable care. It is another thing, we think, to have attached to that boom a steel rope, dark in color, which is sufficiently loose to form a bight which catches passing vessels. The immediate analogy suggested to one's mind is a wire snare put in the woods to catch rabbits.

■ We think there was negligence in permitting the slack cable to be in the position where it caught the stack of The Schermerhorn. We do not think that those in charge of The Schermerhorn were negligent in not seeing the cable. It was night-time and there were plenty of lights on both The Schermerhorn and The Copeland. But this cable is not a heavy one and is dark in color. It seems to us there was no failure of care on the part of the lookout of either the tug or towed barge in failing to discover it.

The learned Trial Judge thought that libellant could not recover because the accident was caused by the navigation of The Schermerhorn in unreasonably close proximity to The Copeland. The tug came within two feet of the ship's side. Counsel for the libellant has earnestly urged upon us that The Schermerhorn was skillfully navigated, that it was a sound practice for the captain to keep his vessel as far upstream as he could since the wind and the tide were both against him, and he had the problem of keeping both tug and scow away from the mud flat. However, it was found as a fact that The Schermerhorn could have kept 30' south of The Copeland without incurring risk of stranding either tug or scow. It is easier to figure such mathematical conclusions in the quiet of chambers than it is upon a January night on the water. We are willing to go along with the conclusion, however, that The Schermerhorn did cut its distance between the tug and ship too closely. But it did not hit the ship until after its stack had been fouled by the wire. If the negligently placed wire had not been where it was, no damage would come from the very close proximity of the two vessels.

■ We have, therefore, a situation where both are at fault,[1] and the rule of admiralty is to divide the total loss equally between the two. Since The Copeland had no injuries, the owners of The Schermerhorn are entitled to recover for half their damage.

The Union Stevedoring Corporation is liable. Its employees swung the boom of The Copeland outward and must necessarily have been the ones who left the dangerous bight in the wire cable. The Parry Navigation Company is not liable. Publicker Commercial Alcohol Co. v. Independent Towing Co., 3 Cir., 1948, 165 F.2d 1002. We think there is sufficient to impose liability for the defective condition of the boom alone upon the owners of the ship. The ship's officer was in charge and acknowledged both his presence and responsibility for general supervision.

■ The stevedoring contract with the Government is of record and requires indemnification of the United States by the stevedores in certain cases. Contrary to the Government's suggestion, however, we do not think that a judgment for the United States against the stevedores is appropriate at this time.[2]

The judgment of the District Court will be reversed and the case remanded for further proceedings not inconsistent with this opinion.

McLAUGHLIN, Circuit Judge (dissenting).

The majority opinion concedes that the tug was negligent in coming into the slip too close to The Copeland. The tug's acting captain, Hunt, admitted that the distance between the vessels was "about two feet". The sole eye witness to the occurrence said that the tug was right up against the paint of The Copeland "about as close as he could get."

There was no emergency here involved. The tug was engaged in a routine job of work which had been going on for years and the dredging operations, including the tug's handling the scows, as the captain of the dredge testified, "were not set up in any way to impede the progress of [coal] loading operations."

As the tug was approaching the slip, Hunt saw the Copeland boom. Regarding it, he says, "I thought it was clear * * *." This was at 7:30 on a January night. Hunt knew that the ship which turned out to be The Copeland "was berthed taking on coal". The Copeland, as found by the district judge, "was illuminated by clusters of floodlights suspended from each of her masts, which illuminated the deck and superstructure of the vessel." Hunt had been taking scows in and out of the Greenwich Coal Pier since its construction, apparently in 1928 or 1929. The position of the particular aft port Copeland boom, swung outboard as it was during the coaling process, was, as found by the court below, "the usual and customary manner of arranging the vessel's booms at the Greenwich Coal Pier. The booms are arranged in this fashion so that they will not interfere with the operation of the stationary coaling machine." [75 F.Supp. 370.] And regarding the period when the booms are extending outboard from vessels, Hunt said, "When they are out we won't go in there, not unless we can go past them." He was entirely familiar with the fact that booms which were swung outboard, of necessity had cables attached to them. He was asked: "Have you ever seen them out when there has been no cable attached to them?" (Emphasis supplied.) And he answered: "No! I don't now how I could. There had to be a cable there, if they are out, to pull them in or something!" (Emphasis supplied.)

From the time of his first faulty observation of the boom when he had mistakenly thought it was clear, Hunt did not claim to have seen it again prior to the accident and does affirmatively say that as he drew up to the stern of The Copeland he could

---

[1] Compare, for somewhat similar facts, The Fulda, D.C.S.D.N.Y.1887, 31 F. 351; The Industry, D.C.S.D.N.Y.1886, 27 F. 767.

[2] The answer on behalf of the United States did not assert any cross-claim against the stevedoring company for indemnity. The point is raised for the first time on this appeal. We think this is a matter for the District Court in the first instance.

not see the boom because his view was obstructed by the roof of his pilot house.

So in that situation Hunt took his tug in so close to The Copeland that it scraped the latter's paint. And the district court logically found that "The proximate cause of the accident was the navigation of the 'Schermerhorn' in unreasonably close proximity to the moored vessel."[3]

According to the tug captain his reason for moving so close to The Copeland was because he was fearful of the mud flat to the south, but his whole maneuver was based on a glaring miscalculation. He thought his empty scow drew seven feet of water whereas it actually drew only four feet. Had Hunt known this, as he himself states, he would have had "very much more room". The tug's master, then, was wrong in this vital instance, as he was utterly wrong in his snap judgment that his forty-five foot stack would clear The Copeland's outboard port boom tackle. I find no justification in the record for putting a premium on such gross negligence by reversing the judgment of the district court.[4]

On Motion for Clarification.

GOODRICH, Circuit Judge.

The United States has moved for clarification of the Court's opinion in the above entitled case to the effect "That the opinion and order of the Court provide that the respondent appellee Union Stevedoring Corporation be held primarily liable for the damages sustained to the tug Schermerhorn and that the respondent appellee United States of America be held secondarily liable for said damages."

This motion will be denied. The Court's opinion regarding the observance of care, or lack of it, by respective parties is self-explanatory, we think. The rights of the respondents against each other under the contract between them were not adjudicated in the District Court nor were they passed upon by us. If the United States has occasion to claim indemnity from Union Stevedoring Corporation and has to resort to litigation to establish its rights, the courts are certainly open for that purpose. But any decision by us concerning such rights at this stage of the litigation would be premature. See American Stevedores, Inc. v. Porello, 1947, 330 U.S. 446, 67 S.Ct. 847, 91 L.Ed. 1011. The case of Slater Fireproof Storage Co. v. Nicholson Transit Co., 7 Cir., 1931, 47 F.2d 734, cited by the Government, is not in point. In that case a controversy of the very kind we are now asked to rule upon was decided in the first instance by the District Court.

The motion will be denied.

---

[3] Even if The Copeland could be said to be at fault, that fault was merely a condition not a cause of the collision, and as Judge Learned Hand said in The Perseverance, 2 Cir., 63 F.2d 788, 790, certiorari denied, Cornell Steamboat Co. v. Lavender, 289 U.S. 744, 53 S.Ct. 692, 77 L.Ed. 1490, " * * * the tug was amply advised in advance of the ship's position, and could have avoided her by proper navigation." See also Matton Oil Transfer Corporation v. The Greene et al., 2 Cir., 129 F.2d 618, 620. This law would all the more strongly apply if The Copeland's hull had been really projecting from the pier at an acute angle as the majority opinion states.

[4] In this case the lower court heard all of the witnesses with the exception of one whose testimony came in by way of deposition. In such situation Judge Denman in The Catalina, 9 Cir., 95 F.2d 283, 284, said: "While this admiralty appeal is a trial de novo, the presumption in favor of the findings of the District Court is at its strongest, since the trial judge heard all the witnesses, save one, and his deposition clearly sustains those heard."